UNITED STATES DISTRICT COURT                    ECF

SOUTHERN DISTRICT OF NEW YORK              07 CV 2889 (AKH)

---

ROYAL & SUN ALLIANCE INSURANCE, PLC,

Plaintiff,

-vs-

OCEAN WORLD LINES,

Defendant & Third Party Plaintiff,

vs.

YANGMING MARINE TRANSPORT CORP. and DJURIC TRUCKING, INC.,

Third Party Defendants.

---

THIRD PARTY DEFENDANTS' ATTORNEY'S DECLARATION OF PAUL M. KEANE  IN SUPPORT OF THEIR MOTION TO:

1.  DISMISS THE CLAIMS AGAINST THEM ON GROUNDS OF A MANDATORY AND EXCLUSIVE FOREIGN FORUM SELECTION CLAUSE, OR

2.  DISMISS THE CLAIMS AGAINST DJURIC ON GROUNDS OF A COVENANT NOT TO SUE, OR

3.  LIMIT THEIR LIABILITY, IF ANY, TO $500 PER PACKAGE\

*Respectfully submitted,*

CICHANOWICZ CALLAN KEANE VENGROW & TEXTOR
61 Broadway 3000, New York, NY 10006
212-344-7042
Attorneys for the Third Party Defendants

TABLE OF CONTENTS

*Page*

1              INTRODUCTION

2              ARGUMENT

               POINT 1:     YMTC'S SEA WAYBILL FORUM CLAUSE APPLIES TO
                            THE CLAIMS INTERPOSED BY PLAINTIFF AND THIRD
                            PARTY PLAINTIFF AND SHOULD BE ENFORCED
                            UNLESS THOSE PARTIES CAN MEET THEIR HEAVY
                            BURDEN OF SHOWING WHY IT SHOULD NOT BE
                            ENFORCED.

8              POINT 2:     THE YMTC SEA WAYBILL CONTAINS A VALID AND
                            ENFORCEABLE CLAUSE BY WHICH PLAINTIFF AND
                            THIRD PARTY PLAINTIFF UNDERTOOK NOT TO SUE
                            ANY OF YMTC'S SUBCONTRACTORS.
                            CONSEQUENTLY, ALL CLAIMS AGAINST DJURIC
                            SHOULD BE DISMISSED.

9              POINT 3:     THE YMTC SEA WAYBILL EXPLICITLY PROVIDES FOR
                            A $500 PER PACKAGE LIMITATION OF LIABILITY FOR
                            LOSS OR DAMAGE OCCURRING INLAND WHILE IN
                            THE CUSTODY OF ITSELF OR ITS TRUCKER AND THUS
                            COMPLIES WITH THE FAIR OPPORTUNITY
                            REQUIREMENT.  SINCE PLAINTIFF CLAIMS FOR LOSS
                            OR DAMAGE TO 4 PACKAGES, THE MAXIMUM
                            LIABILITY OF YMTC AND DJURIC, IF ANY, IS $2,000.

11             POINT 4:     THE CARMACK AMENDMENT ON WHICH PLAINTIFF
                            SUES DOES NOT OPERATE TO DEPRIVE YMTC OR
                            DJURIC OF THE BENEFIT OF THE YMTC FORUM
                            CLAUSE OR THE LIMITATION OF LIABILITY.

18             POINT 5:     A HOLDING THAT DJURIC IS NOT ENTITLED TO
                            THE YMTC SEA WAYBILL DEFENSES RAISED
                            HEREIN WOULD VIOLATE THE LETTER AND
                            SPIRIT OF THE SUPREME COURT'S DECISION IN
                            *KIRBY*

24             CONCLUSION

UNITED STATES DISTRICT COURT      ECF

SOUTHERN DISTRICT OF NEW YORK    07 CV 2889 (AKH)

| | |
|---|---|
| ROYAL & SUN ALLIANCE INSURANCE, PLC,<br><br>                     Plaintiff,<br><br>       -vs-<br><br>OCEAN WORLD LINES,<br><br>   Defendant & Third Party Plaintiff,<br><br>          vs.<br><br>YANGMING MARINE TRANSPORT CORP. and DJURIC TRUCKING, INC.,<br><br>       Third Party Defendants. | THIRD PARTY DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO:<br><br>1.  DISMISS THE CLAIMS AGAINST THEM ON GROUNDS OF A MANDATORY AND EXCLUSIVE FOREIGN FORUM SELECTION CLAUSE, OR<br><br>2.  DISMISS THE CLAIMS AGAINST DJURIC ON GROUNDS OF A COVENANT NOT TO SUE, OR<br><br>3.  LIMIT THEIR LIABILITY, IF ANY, TO $500 PER PACKAGE\ |

## INTRODUCTION

This memorandum is submitted on behalf of third party defendants, YANGMING MARINE TRANSPORT CORP. ("YMTC") and DJURIC TRUCKING, INC. ("DJURIC"), in support of their motion to:

    A.    Dismiss all claims (including the third party claims) against them on the basis of a mandatory and exclusive foreign forum selection agreement in the applicable contract of carriage; or alternatively

    B.    Dismiss DJURIC from this suit on grounds of an enforceable covenant by plaintiff and third party plaintiff not to sue; and/or

    C.    Limit its or their liability, if any, to $500 per package or customary freight unit.

The motions to dismiss DJURIC or to limit liability should only be reached if the forum motion is denied and they are not a waiver of the forum agreement or an admission of liability.

The necessary background and facts of this matter are set out in the accompanying declaration of Paul M. Keane to which the Court is respectfully referred. This brief assumes familiarity with those facts.

ARGUMENT

POINT 1

YMTC'S SEA WAYBILL FORUM CLAUSE APPLIES TO THE CLAIMS INTERPOSED BY PLAINTIFF AND THIRD PARTY PLAINTIFF AND SHOULD BE ENFORCED UNLESS THOSE PARTIES CAN MEET THEIR HEAVY BURDEN OF SHOWING WHY IT SHOULD NOT BE ENFORCED.

A.    ENFORCEABILITY AS TO YMTC

*1.    Generally*

The YMTC sea waybill forum clause is a broad one. It reads in relevant part:

> Except as otherwise provided specifically herein any claim or dispute arising under this Bill shall be governed by the law of England and determined in the English courts to the exclusion of the jurisdiction of the courts of any other place.

*Mov. EXHIBIT FF (and ADDENDUM 1) at Cl. 26.* It is not limited in its applicability to specifically named parties, but instead applies broadly to "any claim or dispute arising under [the] Bill." *Id.* The scope of the YMTC sea waybill, in turn, is also broad. By its terms, it applies not just to the ocean carriage, but to:

> … the whole or any part of the operations and service undertaken by the Carrier in respect of the Goods covered by the Bill.

*Id. at Cl. 1(2).*    Since the YMTC sea waybill expressly provides for through, multimodal carriage [*Mov. EXHIBIT FF, cl. 7(2)*], there should be no dispute that a claim for loss or damage to cargo occurring during land carriage under the YMTC's bill is governed by the bill's forum clause.  See, *Regal-Beloit Corp. v. Kawasaki Kisen Kaisha, Ltd.,* 462 F.Supp.2d 1098,  1100, 1102  (C.D.Cal. 2006) (Enforcing similar forum clause in ocean carrier bill of lading covering cargo lost or damaged in derailment).

The YMTC forum selection clause has recently been held enforceable by Judge Castel in *Nippon Express U.S.A. (Illinois), Inc. v. M/V CHANG JIANG BRIDGE,* ___ WL _____,  (06 CV 694) (S.D.N.Y. Dec. 13, 2007) (ADDENDUM 3).

> [T]he forum selection clause was printed on the Bill of Lading issued by Yang Ming to Nippon Express and thus was reasonably communicated.  …  [T]he clause is mandatory by virtue of its use of the word "shall" and because London jurisdiction is to "the exclusion of … any other place."

*Id.,* Slip Op. at 7.

The YMTC forum clause herein is presumptively valid and can be overcome only by a factual showing of (1) fraud or overreach, (2) that litigation in the chosen forum will be so gravely inconvenient that for all practical purposes, the party opposing the motion be denied its day in court, (3) the fundamental unfairness of the chosen forum may deprive the plaintiff of a remedy, or (4) the clause contravenes a strong public policy of the forum state.  The burden of doing so is a heavy one. E.g., *Challenger Overseas,* supra, 2000 A.M.C. at 2890.

Plaintiff has not pleaded fraud or overreach in its complaint [*see, Mov. EXHIBIT AA*] and there is no reason to believe that a London forum would be gravely inconvenient or fundamentally unfair.  See, *e.g., M/S BREMEN v. Zapata Offshore Co.,* 407 U.S. 1, 17 (1972) (London provides a neutral forum experienced and capable in the resolution of admiralty litigation).  Moreover, the YMTC forum clause contravenes no U.S. public policy which, to the contrary, highly favors the enforcement of such clauses.  See, *Vimar Seguros y Reaseguros S.A. v. M/V SKY REEFER,* 515 U.S. 528 (1995).

Where a forum clause applies, it cannot be avoid by pleading alternative theories sounding in tort rather than contract.  *Roby v. Corp. of Lloyds,* 996 F.2d 1353, 1363 (2d Cir.) cert. den. 510 U.S. 945 (1993); *LPR, SrL v. Challenger Overseas,* 2000 A.M.C. 2887, 2889 – 90 (S.D.N.Y.);  *Bison Pulp & Paper, Ltd. v. M/V PERGAMOS,* 1996 A.M.C. 2022, 2041 (S.D.N.Y. 1995).

### 2.    *Enforceability as to OWL*

OWL's regional office is the named shipper on the YMTC sea waybill which also names OWL as consignee.  *Mov. EXHIBITS EE and GG-2.*   OWL bases its third party indemnity claim, in part, on the YMTC sea waybill which it mistakenly describes as a bill of lading.  *Mov. EXHIBIT BB, paras. 5 and 9.*  Under the circumstances, OWL is bound by the YMTC sea waybill and its London forum clause.  See:

- *All Pac Trading Inc. v. vessel M/V Hanjin Yosu,* 7 F.3d 1427, 1432 (9th Cir. 1993) cert. den. 510 U.S. 1194 (1994) (Party that sues on contract accepts its terms);

- *Mitsui & Co. v. MIRA M/V,* 111 F.3d 33, 36 (5th Cir. 1997) (same);

- *F.D. Import & Export Corp. v. M/V REEFER SUN,* 248 F.Supp.2d 240, 248 – 49 (S.D.N.Y 2002).

### 3.    Enforceability as to Plaintiff

As a subrogated underwriter, plaintiff can ultimately have no greater rights than the shipper on OWL's bill of lading has. *Ferromontan, Inc. v. Georgetown Steel Corp.,* 535 F.Supp. 1198, 1211 (D.S.C. 1982) aff'd 758 F.2d 646 (4th Cir. 1985).

In this case, plaintiff sues on the OWL bill of lading. *Mov. EXHIBIT AA, para. 6.* Not only does the OWL bill give notice that OWL will be using ocean carriers to perform the actual carriage, but it explicitly notifies the shipper that the ocean carriers may have forum, law and jurisdiction clauses of their own. Clauses 1 and 7 of the OWL bill of lading [*EXHIBIT II (and ADDENDUM 2)*] provide in relevant part:

> "Servants or Agents" include the  ... owners and operators of vessels (other than the Carrier), underlying carriers (including ocean common carriers with whom OWL has contracted for the physical transportation of the goods) ... .
>
> … any such Servant or Agent that takes, accedes, or asserts the benefit of this provision by such action consents to the law and jurisdiction provisions of this bill of lading and in so doing *expressly waives any law, forum, and jurisdiction provisions in any underlying agreement, including bill of ladings or service contracts, between itself and [OWL].*

[Bracketed text ours]. Since the third party defendants are not seeking herein to assert third party beneficiary rights accorded them by the OWL bill of lading, there has been no waiver of the YMTC

forum clause.  The Southern District forum clause in the Law and Jurisdiction Clause of the OWL

bill of lading is not to the contrary.  The second sentence of that clause provides:

> This clause supersedes any conflicting clause in bills of lading or other
> documents issued by contractors or sub-contractors of OWL.

*Mov. EXHIBIT II (and ADDENDUM 2).*  Since YMTC is not party to the OWL bill of lading and

claims no rights under it, any claims against it could not be under the OWL bill as the forum clause

requires.  *Id.*  In any case, OWL has no authority to unilaterally waive a provision of its sea waybill

contract with YMTC.

By accepting the OWL bill, the shipper effectively authorized or ratified OWL's sea waybill

contract with YMTC.  In any case, even absent OWL'S clause 7, the general rule is that an ocean

carrier like YMTC generally cannot be sued outside the terms of its lawful sea waybill.  See, e.g.:

- *Stolt Tank Containers, Inc. v. Evergreen Marine Corp.,* 1991 A.M.C. 1761 (S.D.N.Y. 1990) aff'd 962 F.2d 276 (2d Cir. 1982) (Enforcing bill of lading against non-party who knew goods were to be carried by sea and who would benefit from their delivery);

- *Atlantic Mut. Ins. Co. v. M/V President Tyler,* 765 F.Supp. 815, 818 (n.3 and main text) (S.D.N.Y. 1990) (Unreasonable to obligate carrier and ship beyond the terms of their bill of lading.  Absent special circumstances, carrier may assume that one who proffers the goods for shipment can accept bill of lading terms and conditions).

Moreover, OWL, as an NVOCC, acted as agent for plaintiff's shipper.  *S/S American Argosy,* supra,

732 F.2d at 301.  This has two consequences.

- First its familiarity with YMTC's sea  waybill terms and conditions is imputed to

  plaintiff's shipper.  *Pearson v. Black King Shipping Co., Ltd.,* 769 F.Supp. 940, 946

  (E.D.Va. 1991) aff'd 953 F.2d 638 (4th Cir. 1992).

- Second, plaintiff's shipper is bound by the YMTC terms and conditions freely accepted by its NVOCC agent.  See, *Norfolk Southern Railway Co. v. Kirby,* 543 U.S. 14, 34 – 35 (2004) (Applying limited agency rule to bind nonparty plaintiff to bill of lading limitation of liability agreed to by plaintiff's intermediary).

B.    ENFORCEABILITY AS TO DJURIC

Ocean carriers are allowed, by contract, to extend their bill of lading defenses to the subcontractors they engage to perform all or part of the carriage.  No magic words are needed.  All that is required is that the bill of lading unambiguously manifests an intent to do so.  *Norfolk Southern Railway Co.,* supra, 543 U.S. at 30 – 33.  Forum selection provisions are one of the defenses that can be so extended.  *Street, Sound Around Electronics, Inc. v. M/V Royal Container,* 30 F.Supp.2d 661, 663 – 64 (S.D.N.Y. 1999);  *Chisso America, Inc. v. M/V HANJIN OSAKA,* 307 F.Supp.2d 621, 625 (D.N.J. 2003);  *Regal-Beloit Corp.,* supra, 462 F.Supp.2d at 1103.

In this case, the YMTC sea waybill manifests a clear intent to extend the protection of the forum clause to its trucker, DJURIC.  The YMTC bill defines "Carrier" to include not just the bill's issuer (YMTC), but also any "Underlying Carrier."  *Mov. EXHIBIT FF (and ADDENDUM 1), cl. 1(3).*  It defines "Underlying Carrier" to include "motor carrier"[s] which is exactly what DJURIC is.  *Id. at Cl. 1(17).*  Thus, under the terms of the YMTC sea waybill, the forum provision is as enforceable by DJURIC as it is by YMTC.

POINT 2

THE YMTC SEA WAYBILL CONTAINS A VALID AND ENFORCEABLE CLAUSE BY WHICH PLAINTIFF AND THIRD PARTY PLAINTIFF UNDERTOOK NOT TO SUE ANY OF YMTC'S SUBCONTRACTORS.    CONSEQUENTLY, ALL CLAIMS AGAINST DJURIC SHOULD BE DISMISSED.

The motion to dismiss DJURIC should be reached only if DJURIC is denied the benefit of the YMTC sea waybill forum clause.

The YMTC sea waybill cl. 4(2) [*Mov. EXHIBIT FF (and ADDENDUM 1)*] effectively constitutes an agreement by cargo interests not to sue YMTC's subcontractors.  The clause reads:

> In contracting for the following exemptions and limitations of, and exoneration from, liability, the carrier is acting as agent and trustee for all other Persons named in this clause.  *It is understood and agreed that, other than the Carrier, no Person, firm or corporation or other legal entity whatsoever (including ... Underlying Carriers ... and/or any other independent contractors whatsoever utilized in the Carriage) is, or shall be deemed to be, liable with respect to the Goods as Carrier, bailee or otherwise.*

[Emphasis ours]  Such a clause is enforceable.  *Bordeaux Wine Locators Inc. v. Matson Nav. Co.,* 185 F.3d 865, *1 (9th Cir. 1999);  *Limited Brands, Inc. v. F.C. (Flying Cargo) Int'l Transp. Ltd.,* 2006 WL 783459, *8 (2006) reh. den. 2007 WL 1026341 (S.D.Ohio 2007) (Covenant not to sue carrier's subcontractors not a violation of COGSA or the U.S. Supreme Court's decision in *Kirby,* supra).  As a result, the claims and third party claims against third party defendant, DJURIC, should be dismissed if it is not granted the benefit of the YMTC forum clause.

The OWL bill of lading indicates that OWL was effectively authorized to agree to this

YMTC clause as well, since Clause 7 of the OWL bill of lading with plaintiff's shipper contains the

same prohibition:

> The Shipper and Consignee undertake not to sue or proceed against
> any [sub-contractors

*Mov. EXHIBIT II (and ADDENDUM 2)*] [Bracketed text is ours].


POINT 3

THE YMTC SEA WAYBILL EXPLICITLY PROVIDES FOR A $500 PER PACKAGE
LIMITATION OF LIABILITY FOR LOSS OR DAMAGE OCCURRING INLAND WHILE IN
THE CUSTODY OF ITSELF OR ITS TRUCKER AND THUS COMPLIES WITH THE FAIR
OPPORTUNITY REQUIREMENT.  SINCE PLAINTIFF CLAIMS FOR LOSS OR DAMAGE TO
4 PACKAGES, THE MAXIMUM LIABILITY OF YMTC AND DJURIC, IF ANY, IS $2,000.


If the forum motion is denied, YMTC moves to limit any liability it may have to $500 per

package. DJURIC joins in that motion if it, too, is not dismissed from this case. The YMTC sea

waybill has two provisions, either one of which is sufficient to limit their liability.


The first is a general provision that makes a federal statute called "COGSA" the paramount

governing law of the bill to apply before loading, after discharge and throughout the entire time the

goods are in the actual custody of the Carrier, or an Underlying Carrier such as DJURIC.  *Mov.*

*EXHIBIT FF (and ADDENDUM 1),* Cl. 7(1 – 2.A.).  COGSA is the U.S. Carriage of Goods by Sea

Act, 46 U.S.C. 30701, HISTORICAL AND STATUTORY NOTES formerly codified as 46

U.S.C.App. 1300 – 15.  Section 4(5) of the statute provides in relevant part:

9

Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States, or in case of goods not shipped in packages, per customary freight unit, or the equivalent of that sum in other currency, unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading.

The second sea waybill clause is a specific provision which says:

(3)    In the event this Bill covers the Goods moving to or from a port of final destination in the United States, the Carrier's limitation of liability in respect to the Goods shall in no event exceed U.S. Dollars 500 per package, or when the Goods are not shipped in packages, U.S. Dollars 500 per customary freight unit. * * *

(4)    The aforementioned limitations of liability set forth in this provision shall be applicable unless the nature and value of the Goods have been declared by the Merchant before shipment and agreed to by the Carrier, and are inserted in this Bill and the Applicable "ad valorem" freight rate, as set out in the Carrier's Tariff, is paid.

*Mov. EXHIBIT FF (and ADDENDUM 1), Cl. 23.*   Ocean bill of lading clauses which provide for a $500 per package limitation of liability in case of loss or damage to goods occurring on land are valid, and the protection of such provisions may validly extended to the ocean carrier's land-based subcontractors.  1 *Schoenbaum,* supra, at 596 – 97 (citing cases).

To obtain the benefit of a limitation of liability, ocean carriers must comply with the so-called COGSA "fair opportunity" requirement of giving the shipper notice of the limitation and the means for avoiding it by declaring a higher value for the goods.  *General Elec. Co. v. MV Nedlloyd,* 817 F.2d 1022, 1028 - 29 (2d Cir. 1987) cert. den. 484 U.S. 1011 (1988).   In addition to the reverse side clauses incorporating COGSA and providing for a specific limitation of liability where a higher

value is not declared, the YMTC bill also contains a box on its face for entry of the shipper's declared higher value. *Mov. EXHIBIT EE.* All of those things are more than enough to establish compliance with the fair opportunity requirement. *Id.* at 1029; see also, *St. Paul Fire and Marine Ins. Co. v. Thypin Steel Co.,* 1999 WL 639718, *6 - 7 (S.D.N.Y.) ("[I]t appears safe to say that, at a bare minimum, a bill of lading must explicitly incorporate COGSA's provisions or refer in some way to the $500 per package limitation in order to constitute prima facie evidence of fair opportunity.").

Since the YMTC sea waybill contains no declaration of any higher value, its liability and that of DJURIC are limited to $500 per package for a total of $1,000 for the two damaged units. As the named shipper, OWL is bound. The status of plaintiff's shipper as a non-party to the YMTC sea waybill is not a defense to enforcement of the clause against plaintiff. *Stolt,* supra, 1991 A.M.C. 1761, 1766 – 68 (S.D.N.Y. 1991) aff'd 962 F.2d at 279 – 80.

The $500 per package limitation is aggregate, meaning that plaintiff and OWL, together, can recover no more than a single $500 payment from YMTC or DJURIC. There is no right to multiple payments of $500. *Thyssen, Inc. v. S/S Eurounity,* 21 F.3d 533, 540 – 41 (2d Cir. 1994).

POINT 4

THE CARMACK AMENDMENT ON WHICH PLAINTIFF SUES DOES NOT OPERATE TO DEPRIVE YMTC OR DJURIC OF THE BENEFIT OF THE YMTC FORUM CLAUSE OR THE LIMITATION OF LIABILITY.

This case is on all fours with the Supreme Court's seminal decision in *Kirby,* supra, 543 U.S. 14. Here, as in Kirby, an NVOCC intermediary contracted with an ocean common carrier for a U.S. import shipment originating in a foreign country to be carried to a U.S.

11

inland point.  Here, as in *Kirby*, the ocean carrier subcontracted the inland portion of the

move to land carriers (a railroad in *Kirby* - a railroad and trucker in this case).  Here, as in

*Kirby*, the ocean carrier's contract of carriage clearly gave the inland carriers the benefit of

the ocean carrier's defenses including its limitation of liability.  *Id.* at 18 – 22.  In *Kirby,* the

Supreme Court gave effect to the bill of lading's extension of ocean carrier defenses to the

rail subcontractor on grounds that apply equally in this case.  *Id.* at 36.  As a result, the

holding in *Kirby* should apply here unless the parties opposing the motion can come forward

with a compelling reason why it should not.

The only apparent reason is the Second Circuit's decision in *Sompo Japan Ins. Co. of*

*Am. v. Union Pac. R.R.,* 456 F.3d 54 (2d Cir. 2006)  – a decision coming less than two years

after Kirby.  In that case, the Second Circuit held that an ocean carrier's bill of lading was not

effective to give its subcontractor/rail carrier the benefit of the ocean carrier's defenses.  *Id.*

at 75 – 76.  The Second Circuit did not say that an ocean carrier's bill of lading could never

do so, only that it had not done so in that particular case.  *Id.*  This case is distinguishable

from *Sompo* on a number of grounds, including the effectiveness of the YMTC sea waybill in

meeting Carmack's requirements.

A.      THE CARMACK AMENDMENT AND YMTC

YMTC's right to enforcement of the London forum clause and the package limitation

is not affected by the so-called Carmack Amendment.  Carmack is a federal statute which

establishes a uniform liability regime for the common carriage of goods in interstate

commerce by rail and motor carriers.  *Project Hope v. M/V IBN SINA,* 250 F.3d 67, 73 (n.6)

(2d Cir.  2001). As a common carrier of goods by sea, YMTC is not governed by Carmack.


The relevant provision of the Carmack Amendment is 49 U.S.C.A. 14706, which is

the section on which plaintiff bases its suit.  *See, Mov. EXHIBIT AA, para. 3;  Mov. EXHIBIT

BB, para. 8.*  Section 14706(a) - which is captioned "Motor carriers and freight forwarders" –

makes the statute applicable by its terms to a carrier and any other carrier that deliver

property and are providing transportation or service subject to jurisdiction under 49 U.S.C. §

13501.  *Project Hope,* supra at 74.  According to the Second Circuit [*Project Hope,* supra, at

74], the reach of the Carmack Amendment [section 14706] is determined by section 13501

which makes the statute applicable to motor carriers, not ocean carriers:

> The Secretary and the Board have jurisdiction, as specified in
> this part, over transportation *by motor carrier* and the
> procurement of that transportation, to the extent that
> passengers, property, or both, are transported by motor carrier--
> * * * (E) the United States and a place in a foreign country to
> the extent the transportation is in the United States … .

 [Emphasis added].  YMTC is not a motor carrier and is thus not subject to Carmack.  See:

- *Rexroth Hydraudyne B.V. v. Ocean World Lines, Inc.,* 2007 WL 541958, *2
  (S.D.N.Y. 2007) (Rejecting "mistaken" reliance on Carmack Amendment to defeat
  ocean carrier's package limitation for cargo loss occurring inland);

- *King Ocean Cent. America, S.A. v. Precision Cutting Services, Inc.,* 717 So.2d 507,
  513 (Fla. 1998) cert.den. 526 U.S. 1004 (1999) (An ocean carrier's liability was not
  contemplated or covered under the Carmack Amendment).

Ocean carriers like, YMTC, are required to maintain their tariffs under the jurisdiction of the

U.S. Federal Maritime Commission, not the Surface Transportation Board which governs

Motor Carriers.  46 U.S.C. 40501(a)(1) and (c) formerly codified at 46 U.S.App. 1707(a)(1)

and (c)(2)(B).  The Shipping Act includes through carriage within its jurisdiction.  46 U.S.C.

40102(24 – 25) formerly codified at 46 U.S.C.App. 1702(23 – 24); see also, 46 C.F.R.

520.4(j).


There is one case which has held that an ocean carrier is subject to Carmack for the

land portion of a multimodal move.  *Kyodo U.S.A., Inc. v. Cosco North America Inc.,* 2001

WL 1835158 (2001).  However, *Kyodo* determined the reach of Carmack by looking to

section 14706(a)(1).  *Id.* at *4.  As explained above, the Second Circuit has held that

Carmack's reach is determined by section 13501, so the *Kyodo* test is invalid in this Circuit.


B.    THE CARMACK AMENDMENT AND DJURIC

The Carmack Amendment also does not affect the right of DJURIC in this case, to

take advantage of the YMTC bill of lading defenses since a number of factual distinctions

exist between this case and *Sompo.*

*1.    EFFECT OF PRIVATE AGREEMENT BETWEEN YMTC AND OWL*

Carmack does not affect DJURIC's right to assert YMTC defenses since Carmack

only applies to common carriage, [49 U.S.C. § 14706(a)(1)], and the terms and conditions of

OWL's contract with YMTC were privately negotiated.


Under a common carriage scheme, the shipper and carrier typically do not negotiate a

separate contract for each shipment – and the statutory prohibitions against discrimination

between similarly situated shippers would prevent them from doing so in any case.  See, 13

14

C.J.S. *Carriers,* sect. 195 (1990).  The rule of fair opportunity – that a common carrier must

offer its shippers the ability to avoid carrier limitations by paying a higher rate - is relevant to

common carriage cases where, but for a choice of rates offered by the carrier, the shipper

would be forced to accept whatever limited liability rate the carrier offers.  See,  *Brown &*

*Root, Inc. v. M/V PEISANDER,* 648 F.2d 415, 420, n.11  (5th Cir. 1981).    Fair opportunity

has no relevance where the terms of carriage (including the charges) are negotiated ad hoc

[see, e.g., 49 U.S.C. 14101(b)] and where, unlike common carriage, the parties are presumed

to be of equal bargaining power.   See, *Assoc. Metals & Minerals Corp. v. S/S JASMINE,* 983

F.2d 410, 412 (2d Cir. 1993).  Obviously, if the freight charges and other terms are specially

negotiated by the shipper rather than chosen from a menu of  tariff rates, then there is no

need for fair opportunity notice since there is no choice to be made beyond that specially

bargained for.


In this case the carriage of plaintiff's cargo was specially negotiated since there was a

service contract between  OWL and YMTC.  *Miv. EXHIBIT JJ.*  A service contract is a

creature of statute – the statute in question being the U.S. Shipping Act.  46 U.S.C.A.

40102(20) formerly codified at 46 U.S.C.App. 1702(19); 46 U.S.C.A. 40502(a) formerly

codified at 46 U.S.C.App. 1707(c).  The Shipping Act allows an ocean common carrier to

enter into a special contract with a shipper whereby the shipper agrees to ship a certain

minimum quantity of specified cargo(es)  at a specified level of service over certain routes

within a set period of time in consideration of which, the shipper gets the benefit of lower

than common carriage tariff freight rate(s) – i.e., rate(s) negotiated between the parties.  *Id.*

The parties to a service contract can and do decide to what extent, if at all, the ocean carrier can limit its liability for cargo loss or damage. Sturley, "Proposed Amendments to the Carriage of Goods by Sea Act", 13 U.S.F.M.L.J. 1, 18, n.90 (2000) ("The parties to service contracts regularly raise the carrier's liability well above statutory levels").

Where bills of lading are issued pursuant to a service contract, it is the equivalent of a private carriage in which bills of lading are issued pursuant to a charter party. *Great White Fleet v. DSCU Transp.,* 2000 WL 1480404 (S.D.N.Y.);  Hooper, "Carriage of Goods and Charter Parties", 73 TUL.L.REV. 1697, 1728 (1999) ("The service contract is a document more analogous to a charter party than a bill of lading. It is similar to a contract of affreightment.").  By shipping the subject cargoes under the OWL / YMTC Service Contract, OWL and its shipper (plaintiff's subrogor) obtained the benefit of the specially negotiated lower than YMTC's common carriage tariff freight rates.  See, *MAG Portfolio Consultant, GMBH v. Merlin Biomed,* 268 F.3d 58, 61 (2d Cir. 2000)   The OWL / YMTC Service Contract under which the YMTC sea waybills were issued does not make any change to the $500 per package limitation of liability or the sea waybill's choice of forum.  See, *Mov. EXHIBIT JJ, Term 12.*

As a result, even if the YMTC sea waybill failed to comply with Sompo's requirements (which is not the case, *infra*), the forum, dismissal, and limitation motions are not defeated since the rate charged was not one imposed by the carrier's common carriage tariff, but specially negotiated under the service contact .  **Moreover, there was no need or reason for YMTC to want full liability coverage from DJURIC since the cost of**

**obtaining it would exceed the freight it received from OWL under the YMTC sea waybill limiting the latter's liability.**

### 2.    *THE CARGO PLAINTIFF IS NOT THE CARMACK SHIPPER*

The *Sompo* Court treated the cargo plaintiff as the rail carrier's shipper and held that the rail carrier had not offered the cargo plaintiff a rate encompassing full Carmack liability. *Sompo,* supra, 456 F.3d at 75 – 76.  Whatever may have been the case in *Sompo*, it is not the case here.  DJURIC's shipper was not the cargo plaintiff's subrogor, it was YMTC, and DJURIC's compliance with Carmack must be adjudged as between those two parties.  See:

- 4 *Sorkin,* GOODS IN TRANSIT, sect. 22.02 (main text at n. 6.4) (1994) ("As a general rule, the shipper is the party described as shipper on the bill of lading although there may have been prior shippers in the chain of transportation.");

- *R.E.I. Transport, Inc. v. C.H. Robinson Worldwide, Inc.,* 2007 WL 854005, *5 (S.D.Ill.) (Carmack shipper can be agent, independent contractor, broker or other middleman;

- *Polesuk v. CBR Systems, Inc.,* 2006 WL 2796789,*11 (S.D.N.Y.) (same).

Plaintiff can claim no better fair opportunity rights from YMTC than OWL has.  49 U.S.C. 14706(a)(1) (Carmack carrier's liability is only to those entitled to recover under the receipt of bill of lading.

### 3.    *THE SEA WAYBILL PROVIDES CARMACK PROTECTION*

Whatever the case in *Sompo* [see, *id.* 456 F.3d at 75 – 76],  the YMTC sea waybill already provides the appropriate Carmack coverage.  Although sea waybill clauses 7(1) and (2)(A) extend COGSA's coverage throughout the post-discharge period, there is a Cl. 7(2)(B)

which deals with a *Sompo* style fact pattern.  *Mov. EXHIBIT FF*. That clause covers a

situation in which the contractual stipulation to apply COGSA cannot be applied – the case in

*Sompo* where the COGSA extension of coverage was overridden by Carmack.  *Sompo,* supra,

71 – 75.  In such a case, the YMTC sea waybill provides that liability is to be determined in

accordance with the Underlying Carrier's bill of lading and tariff, [*Mov. EXHIBIT FF, Cl.

7(2)(B)*], which are regulated by and subject to *Carmack.  Rehm v. Baltimore Storage Co.,*

300 F.Supp.2d 408, 416 (W.D.Va. Jan 29, 2004). [**1**]   Since full Carmack protection applies

contractually  – as required by *Sompo* – OWL's failure to declare a higher value for the

Shipment should be effective to permit the package limitation to be asserted by Djuric as

well as YMTC.


POINT 5

A HOLDING THAT DJURIC IS NOT ENTITLED TO THE YMTC SEA WAYBILL
DEFENSES RAISED HEREIN WOULD VIOLATE THE LETTER AND SPIRIT OF THE
SUPREME COURT'S DECISION IN *KIRBY*


The *Kirby* Court recognized that the contractual arrangements so common in the U.S.

through carriage of goods are the result of new technology and the evolution of maritime

commerce.  *Kirby,* supra, at 25 – 26.  Its "touchstone concern" was for the uniformity in

---

[1]     The existence of full Carmack protection in the YMTC sea waybill can be shown another
way.  *Sompo* clearly held that the Carmack Amendment had statutory applicability to the U.S.
inland portion of an ocean carrier's through carriage from a foreign port to the U.S.  *Sompo,*
supra, at 68 – 69.  *Sompo* just as clearly held that when the carrier's bill extended COGSA to
cover the preloading / post discharge period, COGSA had force only as a term of the contract
and must be superseded by a conflicting statute such as Carmack.  *Id., at 69 – 75.*  If that is
the case, then there is not even a need for the YMTC sea waybill  to explicitly offer the
shipper full Carmack liability for the inland carriage because the shipper already had those
rights by operation of law.  That means that for purposes of giving one of its inland carriers
the benefit of a contractual $500 package limitation, an ocean carrier's through bill of lading
or sea waybill which complies with the COGSA fair opportunity requirement has also
complied with Carmack.

meaning of maritime contracts – uniformity being essential to the cost efficient operation of

the newly evolved arrangements in maritime commerce.  *Id.* at 28 – 29, 34 - 35.

> As we said in Kossick, when "a [maritime] contract ... may well have been made anywhere in the world," *it "should be judged by one law wherever it was made*.
>
> * * *
>
> [The ocean carrier] would not enjoy the efficiencies of the default rule *if the liability limitation it chose did not apply equally to all legs of the journey for which it undertook responsibility*. And the apparent purpose of COGSA, to facilitate efficient contracting in contracts for carriage by sea, would be defeated.
>
> * * *
>
> [I]f liability limitations negotiated with cargo owners were reliable while limitations negotiated with intermediaries were not, carriers would likely want to charge the latter higher rates. A rule prompting downstream carriers to distinguish between cargo owners and intermediary shippers might interfere with statutory and decisional law promoting nondiscrimination in common carriage. It would also, as we have intimated, undermine COGSA's liability regime.

*Id.* at 28, 29, 35 (Emphasis ours).

A ruling which needlessly prohibits DJURIC from asserting the YMTC sea waybill

defenses on these facts would run counter to everything *Kirby* stands for and create expense

and confusion where none existed before. [**2**]  For example:

---

2    The *Sompo* Court was of the view that the Supreme Court's decision in *Kirby* addressed only
the applicability of state law, and did not address Carmack's applicability because the cargo
owner did not put raise any such issues in their appeal.    *Sompo,* supra, at 74.   However,
none of the parties to *Kirby* raised the issue of state law in the appeal, either.  It was the
Supreme Court that raised the issue of state law on its own accord shortly before oral
argument.  *Crowley*, "The Limited Scope of the Cargo Liability Regime Covering Carriage of
Goods by Sea: The Multimodal Problem," 79 TUL.L.REV. 1461, 1491 (2005).   Given the
sweeping nature of the *Kirby* decision about the scope of maritime law in through carriage, it
is incredible that the Supreme Court would not have asked that the applicability of Carmack

1.      *Loss of Predictability:*  Land carriers throughout the country who already carry goods pursuant to ocean through contracts of carriage issued by ocean carriers could no longer be sure of the full enforceability of those contracts under which they render services. That would violate the principle that Courts should not rewrite contracts freely entered into by the parties.  See, *American Home Assur. Co. v. Merck & Co. Inc.,* 329 F.Supp.2d 436, 444 (S.D.N.Y. 2004)

2.      *Increase in the Cost of Shipping:*  A carrier's freight rates and insurance arrangements are entirely dependent on knowing what their contractual exposure is.  See, *Sturley,* "The COGSA Fair Opportunity Requirement (Part 1)," 19 J.MAR.L. & C., 1, 21 (1988).  Faced with potential unlimited liability, such carriers would have no alternative but to raise their rates substantially to cover the added risk. *Id.*;  *Kirby,* supra, 543 U.S. at 35. The overwhelming 99% of shippers whose goods arrive without loss or damage will derive no benefit from such a result.  Their goods will not arrive any faster or in any better condition. It will just make the cost of shipping higher which is precisely the opposite of what *Kirby* tries to accomplish.

3.      *Loss of Uniformity:*  Under *Kirby* federal maritime law in general and U.S. COGSA in particular are meant to govern the rights and liabilities of participants during the entire through carriage.   *Kirby,* 543 U.S. at 28 – 29.  A contrary rule inserts another federal statute into the mix – one with rights and liabilities inconsistent with COGSA.  *Sompo,* supra,

---

be briefed, as well, if it thought there were any chance it could apply.  In fact, since Carmack preempts state law [*Polesuk v. CBR Systems, Inc.,* 2006 WL 2796789,*6 (S.D.N.Y.)], state law would never apply in an interstate land move under the through ocean bill of lading, and the Court's detailed attempt in *Kirby* to bring order international maritime commerce would amount to little more than holding forth to the ether for all the practical effect it would have on interstate commerce.  **Moreover, the possibility of Carmack's applicability was expressly raised by counsel during oral argument of *Kirby*.**  See, *Norfolk Southern Ry. Co. v. Kirby,* (Oral Argument) 2004 WL 2348277 (2004).  So Justice O'Connor was presumably aware of the issue when she wrote the decision.

456 F.3d at 59 (Holding Carmack to be strict liability based and COGSA to be negligence based).  As the Supreme Court has observed, the greater the lack of uniformity, the more it exacerbates the complexity of liability regimes, the more expensive and inefficient maritime transportation is likely to be.  *Kirby,* 543 U.S. at 28 – 29;  see also, *Sturley,* supra, at 21. Thus, although binding on this Court, *Kirby* should be read as narrowly as possible.

    4.    *Lack of Freedom to Contract:*  It was *Kirby's* view that under the framework it created, "Future parties remain free to adapt their contracts to the rules set forth here, only now with the benefit of greater predictability concerning the rules for which their contracts might compensate."  *Id.* at 36. A contrary ruling in this case would mean that the rights of sophisticated parties of presumed equal bargaining power to order their own affairs is needlessly curtailed - with the economies possible in private contractual arrangements sacrificed in the name of doctrinal purity.

    5.    *Disruption of Expectations:*  The idea that the Carmack Amendment does not apply in the absence of a separate domestic bill of lading can be traced back 50 years to the U.S. Supreme Court's decision in *Reider v. Thompson.  Sompo,* supra, 456 F.3d at 67.  The maritime industry, as it now exists, has been built around that expectation with the overwhelming majority of the federal courts so holding.  *Altadis USA, Inc. ex rel. Fireman's Fund Ins. Co. v. Sea Star Line,* LLC, 458 F.3d 1288, 1291 – 92 (11th Cir. 2006) (Joining the 4th, 6th and 7th Circuits)..  A rule that needlessly allows Carmack to effectively scuttle subcontractor third party beneficiary clauses in ocean carrier bills of lading would disrupt the entire industry for no good purpose.  Unlike *Kirby* which was an affirmance of industry practice, a contrary ruling here threatens to be a disruption of it.

6.      *Inability to Limit Liability:*    The Second Circuit has recognized that a

carrier's limitation of liability is essential to the efficient operation of common carriage.

*AMERICAN ARGOSY,* supra, 732 F.2d at 304; see also, *Sturley,* "The COGSA Fair

Opportunity Requirement (Part 2)," 19 J.MAR.L. & C.,  157, 190 – 202 (1988) (Discussing

the effiency of liability limitations).. [**3**]    A contrary ruling in this case would mean that

inland carriers could for all practical purposes never hope to limit their liability since, for

example, the thousands of truckers who operate in the U.S. would have no way of reaching

foreign shippers located abroad whose identity is shielded through one or more levels of

contracts with or between transportation intermediaries and consolidators.  As the Supreme

Court in *Kirby* explained [*id.*, 543 U.S. at 34 – 35]:

> In intercontinental ocean shipping, carriers may not know if
> they are dealing with an intermediary, rather than with a cargo
> owner. Even if knowingly dealing with an intermediary, they
> may not know how many other intermediaries came before, or
> what obligations may be outstanding among them. If the
> Eleventh Circuit's rule were the law, carriers would have to
> seek out more information before contracting, so as to assure
> themselves that their contractual liability limitations provide
> true protection. That task of information gathering might be
> very costly or even impossible, given that goods often change
> hands many times in the course of intermodal transportation.

 So far, the federal courts, including the Second Circuit, have refused to effectively eviscerate

liability limitations by placing such unreasonable conditions on their exercise.  See, e.g.,

*Carman Tool & Abrasives, Inc. v. Evergreen Lines,* 871 F.2d 897, 900 – 01 (9th Cir. 1989)

followed in *Stolt,* supra, 962 F.2d at 279 – 80.

---

[3]      "In 1906, in the so-called Carmack Amendment  …  , Congress absolutely forbade carriers to
limit their liability to shippers for damage to goods. As a result of this legislation, the carriers
increased shipping rates sharply. Congress reacted to this rate increase by enacting the so-
called Cummings Amendment … which allows a carrier to limit its liability … ." *Rohner
Gehrig Co., Inc. v. Tri-State Motor Transit,* 950 F.2d 1079, 1082 (5th Cir. 1992).

The existence of these problems has have been acknowledged by the Eleventh Circuit which observed:

> Altadis' position in this case is in tension with Norfolk Southern in that it would introduce uncertainty and lack of uniformity into the process of contracting for carriage by sea, upsetting contractual expectations expressed in through bills of lading. Given the holding of Norfolk Southern, which recognizes that a rail carrier on the inland leg of a maritime contract is protected by the limitations in a through bill of lading, Altadis' position would introduce a different result if the inland carrier were a motor carrier. The purpose of COGSA to "facilitate efficient contracting in contracts for carriage by sea" would be undermined.

*Altadis, supra,* 458 F.3d at 1293 – 94.

In the *AMERICAN ARGOSY* , supra, 732 F.2d at 304, the Second Circuit declined to decide important questions of maritime law on the basis of "doctrinal purity,"  recognizing instead that logic and sound policy played an important part.

> Our ruling is not motivated by an abstract concern for doctrinal purity but by our objection to the expansion of a common carrier's liability beyond the limits of logic and Congressional policy. The result below is also inconsistent with existing federal maritime law.  * * * The district court's decision would also threaten the role of the bill of lading as an effective means for carriers to limit their liability.  * * * Moreover, the bill of lading constitutes prima facie evidence of a cargo's value, thereby preserving the carrier's ability to appraise its potential liability and to obtain appropriate insurance. Expanding the doctrine of ratification to cover bills issued by NVOCCs, however, would undermine that policy. * * * It would be both expensive and perhaps impossible to obtain such protection against the acts of each of the hundreds of shippers and middlemen who book freight on each voyage. Even if coverage were available the effect would be to increase the cost of

shipping substantially-a result Congress sought to avoid in
enacting the existing statutory scheme.

That approach is as sound in this case as it was in *AMERICAN ARGOSY* and the decision in

this case, as in *Kirby*, should consider the impact of an adverse ruling on the maritime

industry as a whole.

CONCLUSION

The motion should be granted.

Dated: New York, NY                    *Respectfully submitted,*

     December 21, 2007          CICHANOWICZ CALLAN KEANE VENGROW
                      & TEXTOR
                      61 Broadway 3000, New York, NY 10006
                      212-344-7042
                      Attorneys for the Third Party Defendants

                      By:    /s/ _____PAUL M. KEANE_____
                              Paul M. Keane [PK- 5934]

**ADDENDUM 1**
**[Selected YMTC Sea Waybill Terms and Conditions]**

1.     **DEFINITION**

\* \* \*

(2)     "Carriage" means the whole or any part of the operations and service undertaken by the Carrier in respect of the Goods covered by the Bill.

(3)     "Carrier" means the party on whose behalf this Bill is issued, as well as … Underlying Carrier whether any of them is acting as Carrier or bailee.

\* \* \*

(11)     "Merchant" includes the shipper, Holder, consignee or receiver of the Goods or any Person owning or entitled to the possession of the Goods or this Bill and anyone acting on behalf of such Person.

(12)     "Multimodal Transport" arises if the Place of Receipt and/or the place of Delivery are indicated on the face hereof in the relevant spaces.

\* \* \*

(17)     "Underlying Carrier" includes any … motor … carrier utilized by the Carrier for any parts of the transportation the [*sic*] shipment covered by this Bill.


3.     **MERCHANT'S WARRANTY**

The Merchant warrants that in agreeing to the terms hereof he is, or has the authority of, the Person owning, or entitled to possession of the Goods and this Bill.


4.     **EXEMPTIONS AND IMMUNITIES OF SERVANTS, AGENTS, STEVEDORES AND OTHER SUBCONTRACTORS.**

(1)     The carrier shall be allowed to sub-contract the whole or any part of the Carriage on any terms whatsoever.

(2)     In contracting for the following exemptions and limitations of, and exoneration from, liability, the carrier is acting as agent and trustee for all other Persons named in this clause.  It is understood and agreed that, other than the Carrier, no Person, firm or corporation or other legal entity whatsoever (including … Underlying Carriers … and/or any other independent contractors whatsoever utilized in the Carriage) is, or shall be deemed to be, liable with respect to the Goods as Carrier, bailee or otherwise. If, however, it shall be adjudged that any person other than the Carrier is Carrier or bailee of the Goods or under any responsibility with respect thereto, then all exemptions and limitations of, and exonerations from, liability provided by law or by the terms in this Bill shall be available to such Person.

(3)     It is also agreed that each of the aforementioned Persons referred to in the preceding clause are intended beneficiaries, but nothing herein contained shall be construed to limit or relieve from liability for acts arising or resulting from their fault or negligence.

**7.**    (1)    Port-to-Port Shipment - * * *  Notwithstanding the preceding provision, in the event that this Bill covers shipments to or from the United States, then COGSA shall be compulsorily applicable and shall (except as may be otherwise specifically provided elsewhere herein) also govern before the Goods are loading [*sic*] on  and after they are discharged from the Vessel provided, however, that the Goods at said times are in the actual custody of the carrier or any Underlying Carrier or Subcontractor.

   (2)    (A)    Multimodal Transport – With respect to Multimodal Transportation from, to, or within the United States, when the Goods are in the custody of the Carrier, or any Underlying Carrier, such Multimodal Transportation shall be governed by the Provisions of Clause 7(1).

   (B)    In the event clause 7(1) is held inapplicable to such Multimodal Transportation from, to or within the United States then the Carrier's liability will be governed by and subject to the terms and conditions of the Underlying Carrier's Bill and / or, where applicable, the ICC Uniform Bill of Lading together with the Underlying Carrier's Tariff which shall be incorporated herein as if set forth at length.

## 23.    LIMITATION OF LIABILITY

* * *

   (3)    In the event this Bill covers the Goods moving to or from a port of final destination in the United States, the Carrier's limitation of liability in respect to the Goods shall in no event exceed U.S. Dollars 500 per package, or when the Goods are not shipped in packages, U.S. Dollars 500 per customary freight unit. * * *

   (4)    The aforementioned limitations of liability set forth in this provision shall be applicable unless the nature and value of the Goods have been declared by the Merchant before shipment and agreed to by the Carrier, and are inserted in this Bill and the Applicable "ad valorem" freight rate, as set out in the Carrier's Tariff, is paid.

## 26.    JURISDICTION

Except as otherwise provided specifically herein any claim or dispute arising under this Bill shall be governed by the law of England and determined in the English courts to the exclusion of the jurisdiction of the courts of any other place.  * * *

**ADDENDUM 2**
**[Selected OWL Bill of Lading Terms and Conditions]**

## 1. Definitions

* * *

"Carriage" means the whole or any part of the operations and services undertaken by the Carrier in respect of the Goods covered by this Bill of Lading.

* * *

"Merchant" includes the Consignor, Shipper, Holder, Consignee, the receiver of the Goods, any person, including any Corporation or other legal entity, owning or entitled to the possession of the Goods or this Bill of Lading and anyone acting on behalf of such person.

* * *

"Servants or Agents" include the Master, Officer and crew of the vessel, owners and operators of vessels (other than the Carrier), underlying carriers (including ocean common carriers with whom OWL has contracted for the physical transportation of the goods), subcontractors, stevedores, terminal and groupage operators, road and rail transport operators and any independent contractors employed by the Carrier in the performance of the Carriage.

## 4. Shipper's Responsibility

* * *

(B) The Merchant warrants that in agreeing to the terms and conditions hereof he is, or has the authority of, the Person owning or entitled to the possession of the Goods and this Bill of Lading.

## 5. Carrier's Responsibility and Clause Paramount

* * *

(B) 1(c)

The Carrier's maximum liability hereunder shall in no circumstances exceed US$2 per kilo of gross weight of the Goods lost or damaged unless the value of the Goods has been declared by the Merchant with the consent of the Carrier and excess freight has been paid whereupon the declared value (if higher) as shown on the face of the Bill of Lading shall be substituted for the above limit and any partial loss or damage shall be adjusted pro rata on the basis of such declared value.

(D) USA Clause Paramount (if applicable)

1.       If carriage includes carriage to, from or through a port in the United States of America this Bill of Lading shall be subject to COGSA, the terms of which are incorporated herein and shall be paramount throughout carriage by sea and the entire time that the Goods are in the actual custody of the Carrier or its sub-contractor at the sea-terminal in the United States of America before loading onto the Vessel or after

discharge therefrom as the case may be. COGSA shall be extended to apply to all Goods before the Goods are loaded on and after they are discharged from the Vessel and throughout the entire time during which the Carrier is responsible for the goods under the Bill of Lading.

* * *

3.      If COGSA applies then the liability of the Carrier shall not exceed US$500 per package or customary freight unit unless the value of the Goods has been declared on the face hereof with the consent of the Carrier and extra freight has been paid in which case Clause 10 shall apply and the declared value (if higher) shall be substituted for the limit and any partial loss or damage shall be adjusted pro-rata on the basis of such declared value.

## 7.      Sub-Contracting

Because the Carrier requires the assistance of others to perform the services undertaken under this Bill of Lading as well as transportation agreements between Carrier and others, every servant, agent, stevedore, terminal services contractor, lighter operator, pilot, connecting rail, motor, water, or air carrier or other independent contractor, including their agents, servants and subcontractors, performing such services shall have the benefit of every exemption from and limitation of liability, defense, right and liberty to which the Carrier is entitled, under any provision of this Bill of Lading or by applicable law, provided however that any such Servant or Agent that takes, accedes, or asserts the benefit of this provision by such action consents to the law and jurisdiction provisions of this bill of lading and in so doing expressly waives any law, forum, and jurisdiction provisions in any underlying agreement, including bill of ladings or service contracts, between itself and the Carrier. For purposes of the foregoing provision, the Carrier shall be deemed to be the agent or trustee for the benefit of all such persons and all such persons shall be deemed to be parties to the contract of carriage evidenced hereby to that extent. The Shipper and Consignee undertake not to sue or proceed against any such persons. In the event either of them does so, it shall indemnify the Carrier against all resulting loss, liability, and expense, including attorneys' fees.

## Law & Jurisdication

Whenever the "Carriage of Goods by Sea Act ("COGSA") of the United States of America applies by virtue of paragraph 5, this contract of carriage is to be governed by United States law (exclusive of its choice of law rules) and the United States Federal Court for the Southern District of New York is to have exclusive jurisdiction to hear all disputes hereunder including third party proceedings or those involving several defendants. This clause supersedes any conflicting clause in bills of lading or other documents issued by contractors or sub-contractors of OWL.

# ADDENDUM 3

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
NIPPON EXPRESS U.S.A. (ILLINOIS), INC.,

                      Plaintiff,

           -against-

M/V CHANG JIANG BRIDGE and YANG
MING MARINE TRANSPORT
CORPORATION,

                     Defendants.
-------------------------------------------------------------x

                                    06 Civ. 694 (PKC)

                              MEMORANDUM
                              <u>AND ORDER</u>

P. KEVIN CASTEL, District Judge:

          Plaintiff Nippon Express U.S.A. (Illinois), Inc. ("Nippon Express") alleges that it hired defendants Yang Ming Marine Transport Corp. ("Yang Ming") and M/V Chang Jiang Bridge ("Vessel") to transport 8,400 ink toner cartridges (the "Shipment") from Oakland, California to Tokyo, Japan.  Plaintiff further alleges that the Shipment was not properly cared for during transport, causing it to suffer damage in excess of $500,000.  Plaintiff's complaint, which was filed on January 30, 2006, seeks damages for breach of contract and negligence and also seeks indemnification and contribution.  Defendant Yang Ming's answer asserts several affirmative defenses and the existence of a mandatory London forum selection clause in the bill of lading issued to Nippon Express by Yang Ming.  Yang Ming now moves to dismiss Nippon Express's complaint against it based on the forum selection clause.

          In opposition, Nippon Express contends that the bill of lading containing the London forum selection clause has been superseded by a stevedore contract which

calls for disputes to be addressed through arbitration in Los Angeles, California. For the reasons discussed below, defendant's motion will be granted and the complaint will be dismissed as to Yang Ming.

I.    Factual Background

In September 2004, Nippon Express, a non-vessel operating common carrier (also known as an intermediate cargo carrier), was hired by non-party Canon USA, Inc. ("Canon") to transport the Shipment from Oakland, California to Tokyo, Japan. Nippon Express, in turn, hired Yang Ming to do the actual transpacific shipping. On September 25, 2004, Yang Ming issued bill of lading # YMLUW160067969 ("Bill of Lading") to Nippon Express covering "8,400 CTNS"of printer cartridges "on 200 pallets." (Maloof Decl., Exh. A.) The total value of the Shipment exceeded $1 million.

After the cartridges were shipped to the TransBay Container Terminal ("Terminal") in Oakland, but before the Shipment began its ocean voyage, Nippon Express was notified by Canon that because temperatures inside shipping containers can exceed 140 degrees Fahrenheit during transpacific voyages, the Shipment should be refrigerated during its journey to Japan lest it suffer heat damage. On September 23, 2004, Nippon Express sent an "urgent" request to Yang Ming to "dray off" or remove the Shipment from the other cargoes being loaded so that proper refrigerated containers could be used. (Id., Exh. C.) Yang Ming informed the Terminal of the "dray-off" order, yet, due to an oversight, the Shipment was not separated from the rest of the cargoes and the Terminal placed the Shipment into five unrefrigerated containers, four of which were positioned in the top row of containers on the Vessel's deck and exposed to direct sunlight during transport. (Id., Exh. D.) Shortly after the Vessel set sail for Japan, Yang

3

Ming emailed Nippon Express and stated that due to "our terminal's negligence" the dray-off order was not followed. (Id., Exh. F.)

When the Shipment arrived in Japan, a sample of the cartridges was tested by a licensed Japanese cargo surveyor. The test revealed that there had been a deterioration of ink quality in the black-ink cartridges. (Id., Exh. D.) The surveyor concluded that the cause of the deterioration was excessive heat during transport and noted that black ink is more sensitive to heat than other ink colors, undergoing chemical change at 40 degrees Celsius (104 degrees Fahrenheit). (Id.) All 4,620 black ink cartridges in the Shipment were deemed irreparable and of no value.

Canon looked to its insurer, non-party Sompo Japan Insurance Co. ("Sompo"), to pay for the damage done to the Shipment and, in June 2006, Canon received ¥60,618,321 (approximately $525,000) from Sompo to cover the loss. (Id., Exh. E.) Nippon Express, anticipating a claim against it by Sompo as Canon's subrogee, filed the instant action against Yang Ming and the Vessel "primarily to protect [against] a potential time bar." (3/9/06 Endorsed Ltr., Docket #7.)

In May 2006, Nippon Express made an application to this Court to place the action on the Court's suspense docket for six months because no lawsuit had yet been filed against Nippon Express and it hoped that "this protective lawsuit for indemnity and filed as a precaution" could be withdrawn or amicably resolved. (5/24/06 Endorsed Ltr., Docket # 8.) Nippon Express's application was granted and the matter was placed on the suspense docket, subject to dismissal if it was not restored to the active calendar by November 30, 2006. In late November 2006, Nippon Express requested that the matter remain on the suspense docket until May 30, 2007 because it was in the process of

4

"negotiating with Japanese interests to resolve the underlying cargo claim." (11/27/06 Endorsed Ltr., Docket # 9.) Again, the Court granted Nippon Express's application. (Id.)

In December 2006, Nippon Express's insurer, non-party NipponKoa, settled with Sompo for $55,000 and Sompo assigned to NipponKoa all remaining claims it had related to the damaged Shipment. (Maloof Decl., Exh. G.) Four months later, Nippon Express notified the Court that it had "resolved its underlying cargo claim with Japanese interests" and requested that the matter be placed on the Court's active calendar. (4/27/07 Endorsed Ltr., Docket # 10.) The case was reinstated to the active calendar on April 26, 2007. (Id.) Thereafter, Nippon Express requested permission to move the Court to substitute as plaintiff its insurer, NipponKoa. Yang Ming, thereafter, made the instant motion to dismiss on the basis of the London forum selection clause. Pending the outcome of this motion, the Court preserved plaintiff's substitution motion and defendant's right to move for a transfer of venue to California. (5/11/07 Minute Entry.)

On June 1, 2007, Nippon Express made an application for a two-week extension to file its opposition to Yang Ming's motion to dismiss because, among other reasons, it "learned that there is more than one contract of carriage which may be implicated by the claims at issue" and it was "still attempting to understand the implications of that contract." (6/4/07 Endorsed Ltr., Docket 16.) Nippon Express's application for an extension was granted and its opposition papers were filed on June 12, 2007. Yang Ming filed its reply papers on June 19, 2007 and Nippon Express submitted a sur-reply on June 22, 2007. On July 5, 2007, Yang Ming filed a rejoinder memorandum in response to Nippon Express's sur-reply. On November 20, 2007, the Court was informed by the parties that the wrong stevedore contract had been produced

5

during discovery by Yang Ming.  (11/20/07 Endorsed Ltrs., Docket 23, 24.)  The correct

stevedore contract was produced by Yang Ming and filed by Nippon Express on

November 28, 2007.  (2d Maloof Decl., Docket 25.)

    II.    <u>Discussion</u>

       A.  <u>Legal Standards</u>

          Yang Ming fails to state the procedural rule under which it makes its

motion to dismiss.  That omission is not surprising since there is no Federal Rule of Civil

Procedure tailored to address the enforcement of a forum selection clause.  <u>See</u> <u>New</u>

<u>Moon Shipping Co. v. Man B&W Diesel AG</u>, 121 F.3d 24, 29 (2d Cir. 1997) ("[T]here is

no existing mechanism with which forum selection enforcement is a perfect fit.")

(citation omitted).  Neither the Supreme Court nor the Second Circuit has "designated a

single clause of Rule 12(b) as the 'proper procedural mechanism to request dismissal of a

suit based upon a valid forum selection clause . . . .'"  <u>Asoma Corp. v. SK Shipping Co.</u>,

467 F.3d 817, 822 (2d Cir. 2006) (quoting <u>New Moon</u>, 121 F.3d at 28).  Courts in this

Circuit appear to prefer Rule 12(b)(3) as the procedural device used to enforce a forum

selection clause.  <u>See</u> <u>Zurich Ins. Co. v. Prime, Inc.</u>, 419 F. Supp. 2d 384, 386 (S.D.N.Y.

2005) ("[C]ourts of this circuit have made clear that courts do possess the ability under

either Rule 12(b)(3) or § 1406(a) to dismiss a case upon a motion that a forum selection

clause renders venue in a particular court improper.") (citations omitted).  I therefore

deem the instant motion made pursuant to Rule 12(b)(3) because, among other reasons,

that rule "allows courts to consider materials [such as a contractual forum selection

clause] outside the pleadings."  <u>Jockey Int'l Inc. v. M/V Leverkusen Express</u>, 217 F.

Supp. 2d 447, 450 (S.D.N.Y. 2002).

6

In deciding a motion to dismiss based on a forum selection clause, the plaintiff is entitled to "have the facts viewed in the light most favorable to it" and to be heard before any disputed facts are resolved against it. New Moon, 121 F.3d at 29. The plaintiff bears the burden of overcoming a presumption of the forum selection clause's enforceability. See M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 10 (1972) (forum selection clauses are prima facie valid unless enforcement is shown by resisting party to be unreasonable under the circumstances). The Second Circuit has endorsed a four-part analysis to determine whether to dismiss a claim based upon the existence of a valid forum selection clause. See Phillips v. Audio Active Ltd., 494 F.3d 378, 383-84 (2d Cir. 2007). The court first considers whether "the clause was reasonably communicated to the party resisting enforcement" Id. (citation omitted). Second, the court considers whether the clause is mandatory. Id. (citation omitted). Third, it considers whether the claims and parties are subject to the clause. Id. (citation omitted). In the fourth and final step, the court determines "whether the resisting party has rebutted the presumption of enforceability by making a sufficiently strong showing that 'enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching.'" Id. (quoting M/S Bremen, 407 U.S. at 15).

B. Facts Applied to Law

The forum selection clause at issue states as follows:

Except as otherwise provided specifically herein any claim or dispute arising under the Bill of Lading shall be governed by the laws of England and determined in English courts sitting in the city of London to the exclusion of the jurisdiction of the courts of any other place. In the event this clause is inapplicable under local law, then jurisdiction and choice of law shall lie either in the port of loading or port of discharge at Carrier's option.

(Bill of Lading, § 26.)  Here, there is no dispute with respect to the first two prongs of the

four-part test.  As to the first prong, the forum selection clause was printed on the Bill of

Lading issued by Yang Ming to Nippon Express and thus was reasonably communicated.

As to the second prong, the clause is mandatory by virtue of its use of the word "shall"

and because London jurisdiction is to "the exclusion of . . . any other place."  See John

Boutari & Son, Wines & Spirits, S.A. v. Attiki Importers & Distribs. Inc., 22 F.3d 51, 52-

53 (2d Cir. 1994) (forum selection clause mandatory when venue and jurisdiction

specified with exclusive or mandatory language).

   The third prong—whether the claims and parties are subject to the

clause—is contested.  Because the dispute involves a question of law, i.e. whether

Nippon Express's claims and the parties are subject to the clause, no hearing is required.

See New Moon, 121 F.3d at 29.  Nippon Express argues that the claims and parties are

not subject to the Bill of Lading's forum selection clause because another provision of the

Bill of Lading has been implicated that directs the terms and conditions of an underlying

carrier contract to be incorporated into the Bill of Lading.  The Bill of Lading provision

that Nippon Express relies upon states in relevant part:

> Notwithstanding the foregoing, in the event there is a private contract of
> Carriage between the Carrier and any Underlying Carrier, such
> Mulitmodal Transportation will be governed by the terms and conditions
> of said contract which shall be incorporated herein as if set forth at
> length . . . .

(Bill of Lading, Section 7(B)(2).)

   Nippon Express asserts that the stevedores selected by Yang Ming to load

and unload cargo are "[u]nderlying [c]arrier[s]."  It argues that the terms of the contract

between Yang Ming and non-party TransBay Container Terminal Inc ("TransBay"), the

stevedoring company that loaded the Shipment onto the Vessel, has superseded the terms

of the Bill of Lading issued to Nippon Express by Yang Ming.  The stevedore contract

between Yang Ming and TransBay (the "Stevedore Contract") is entitled "Container

Stevedoring and Service Agreement" and provides that disputes are to be governed by

California law and are to be arbitrated in California.  (Stevedore Contract, §§ 10-11.)

Yang Ming argues that the Stevedore Contract has not been incorporated into the Bill of

Lading because that contract is not "a private contract of Carriage between the Carrier

and an[] Underlying Carrier" as defined by the Bill of Lading.  A stevedore is not an

underlying carrier, Yang Ming contends, because carriers transport passengers or

property while stevedores move cargo around port terminals and onto vessels.  Nippon

Express espouses a much broader view of who is to be considered an underlying carrier

under the Bill of Lading and takes the position that any subcontractor engaged in any

aspect of the transportation of the shipment is an underlying carrier as that term is defined

in the Bill of Lading.

        As an initial matter, I note that the complaint pleads breach of the Bill of

Lading and makes no mention of a stevedoring contract.  In fact, the only other contract

specifically mentioned in the complaint is the waybill issued by Nippon Express to

Canon, the owner of the Shipment.  Nevertheless, I will address the merits of Nippon

Express's contractual arguments.

        As the parties have framed the issue, if TransBay, acting as stevedore, is

an "[u]nderlying [c]arrier" pursuant to the Bill of Lading, then the Stevedore Contract's

terms and conditions govern and the London forum selection clause is inapplicable.  If

TransBay is not an "[u]nderlying [c]arrier" pursuant to the Bill of Lading, then the claims

and the parties are subject to the mandatory and exclusive London forum selection clause

9

and the third prong of the Second Circuit's test has been satisfied; i.e. the claims and the

parties are subject to the clause.  See Phillips, 494 F.3d at 383.  For the reasons that

follow, I conclude that the Stevedore Contract between Yang Ming and TransBay is not a

"private contract of carriage between the carrier and any Underlying Carrier" and has not

been incorporated into the Bill of Lading pursuant to its section 7(B)(2).  Thus, the

exclusive forum selection clause requiring disputes under the Bill of Lading to be heard

by English courts sitting in London is applicable.

           "Underlying Carrier" is defined in the Bill of Lading as "Any water, rail,

motor, air or other carrier utilized by the Carrier for any part of the transportation of the

shipment covered by this Bill of Lading."  (Bill of Lading, § 1.)  The Bill of Lading does

not define "stevedore" and, in fact, it appears that contextual definitions of that term are

rare.  The Oxford English Dictionary defines it as "[a] workman employed either as

overseer or labourer in loading and unloading the cargoes of merchant vessels."  Oxford

English Dictionary (2d ed. 1989).  This definition comports with the meaning ascribed by

case law and legislation.  For example, as noted by the Eighth Circuit, "the term

'stevedore' and longshoreman' seem to be used interchangeabley [by the Supreme Court]

. . . Webster's Dictionary defines both 'stevedore' and longshoreman' as workers who

load and unload vessels."  Reed v. ULS Corp., 178 F.3d 988, 991 n.3 (8th Cir. 1999)

(citing Scindia Steam Navigation Co. v. De Los Santos, 451 U.S. 156, 156-57 (1981)).

The Waterfront Commission Compact between the States of New York and New Jersey

defines "stevedore" as "a contractor (not including an employee) engaged for

compensation pursuant to a contract or arrangement with a carrier of freight by water, in

moving waterborne freight carried or consigned for carriage by such carrier on vessels of

such carrier berthed at piers, on piers at wich such vessels are berthed or at other waterfront terminals." N.J. Stat. Ann. § 32:23-6. The Third Circuit has interpreted this definition to describe "contractors who provide loading services for others." <u>Waterfront Com'n of New York Harbor v. Elizabeth-Newark Shipping, Inc.</u>, 164 F.3d 177, 185 (3d Cir. 1998). Although stevedores presumably "transport" cargo on and off ships and to and from nearby terminal holding facilities or trucks, the element of "transportation" is <u>de minimus</u> and incidental to the stevedore's main function of loading and unloading vessels. <u>See</u> <u>Nippon Fire & Marine Ins. Co. v. Skyway Freight Systems, Inc.</u>, 235 F.3d 53, 60 (2d Cir. 2000) ("[T]he fact that an air carrier temporarily may have stored the goods does not render the carrier a warehouseman, subject to common law warehouseman's duties, so long as the storage was only temporary and incidental to the primary goal of interstate shipment.") (citation omitted).

Nippon Express places great weight on the phrase "for any part of the transportation" found in the definition of "[u]nderlying [c]arrier" and invites the Court to adopt its conclusion that stevedores are "[u]nderlaying [c]arrier[s]" because "moving cargo around a terminal and onto vessels is a critical part of the transportation." (Pl. Mem. at 6.) However, even if the stevedore's moving of cargo is part of the transportation, stevedores must first be carriers before they can be deemed "[u]nderlying [c]arriers" because the definition is limited to "water, rail, motor, air or other <u>carrier[s]</u>" who provide part of the transportation. (Bill of Lading, § 1(l) (emphasis added).)

The Bill of Lading's definition of "Carrier" is limited to "Yangming Marine Transport Corporation" and is therefore unhelpful. (Bill of Lading, § 1(b).) The United States Carriage of Goods Act ("COGSA"), however, defines it as "the owner

11

manager, charters or master of a vessel [which] includes the owner or the charterer who

enters into a contract of carriage with a shipper." 46 U.S.C. § 30701. Nothing in that

definition indicates an intent to include stevedores and, indeed, case law makes clear that

stevedores are not covered by this definition. See De Laval Trubine, Inc. v. West India

Industries, Inc., 502 F.2d 259, 264 (2d Cir. 1974) ("The term 'carrier' . . . is defined as

including 'the owner or charterer who enters into a contract of carriage with a shipper. . .

. stevedores and agents do not fit within this definition. . . .") (citing Robert C. Herd &

Co., Inc. v. Krawill Machinery Corp., 359 U.S. 297, 302 (1959)); accord Generali v.

D'Amico, 766 F.2d 485, 487 (11th Cir. 1985).

    Stevedores do not contract to transport passengers or goods. They

contract to load and unload ship cargoes and are therefore not carriers as that term is

understood, both generally and in the technical context of admiralty. Had the defined

term "Underlying Carrier" been meant to include stevedores under the Bill of Lading,

then, at minimum, the definition would have included references to subcontractors of

carriers. See Cabot Corp. v. S.S. Mormacscan, 441 F.2d 476, 478-79 (2d Cir. 1971)

("[A]n intention to extend benefits of [a Himalaya clause] to the stevedore would most

naturally have been expressed by the addition of the term 'stevedore' to the long list of

various persons under the definition of 'carrier . . . .'") (citations omitted). As defined by

the Bill of Lading, "'Subcontractor' includes owners and operators of Vessels (other than

the Carrier), slot chartered owners, stevedores, terminal and group age operators,

Underlying Carriers and any independent contractor employed by the Carrier in the

performance of the Carrier." (Bill of Lading, § 1(k) (emphasis added).) It is significant

that the Bill of Lading separately lists "stevedores" and "Underlying Carriers" in the

single definition of "Subcontractors" because it indicates an intent to ascribe a separate and distinct meaning to those two words.  Moreover, it shows that the contracting parties knew how to include stevedores when such inclusion was intended.

I will now address the fourth and final prong of the Second Circuit test, "whether the resisting party has rebutted the presumption of enforceability by making a sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching."  Phillips 494 F.3d at 383-84 (citation and internal quotation marks omitted).  Nippon Express does not argue that enforcement of the clause "would be unreasonable or unjust" or that the clause is invalid due to "fraud or overreaching."  Id.  In a footnote, however, it notes that there are no witnesses or documents in the United Kingdom and that the claims "are now almost certainly time-barred there."  (Pl. Mem. at 7.)  That a claim may be time-barred in a foreign jurisdiction should not dictate the result of motion to dismiss an action based on the existence of a valid forum selection clause.  See New Moon, 121 F.3d at 33 ("[C]onsideration of a statute of limitations [in deciding a motion to dismiss on the basis of a forum selection clause] would create a large loophole for the party seeking to avoid enforcement of the forum selection clause.  That party could simply postpone its cause of action until the statue of limitations has run in the chosen forum and then file its action in a more convenient forum."); American Home Assur. Co. v. M/V Jaami, 06 Civ. 287 (LBS), 2007 WL 1040347, *3 (S.D.N.Y. April 4, 2007) ("Courts in this district have held repeatedly that a time bar in a foreign jurisdiction is not a basis for invalidating a forum selection clause.") (citations omitted).

13

Here, Nippon Express had notice of the forum selection clause well prior to bringing suit in New York, thus there is no reason to depart from the usual rule. See LPR, SRL v. Challenger Overseas, LLC., 99 Civ. 8883 (JGK), 2000 WL 973748 at *7 (S.D.N.Y. July 13, 2000) (granting motion to dismiss on basis of mandatory forum selection clause despite plaintiff's contention of prejudice because its action was time-barred in Italy leaving it without a forum). As noted by Judge Koeltl, "[t]here is no reason to depart from this usual rule in this case because the plaintiff had sufficient notice of the forum selection clause. It chose to bring the action in this Court in the face of a clear forum selection clause." Id. In addition, Nippon Express's passing mention that no witnesses or documents are located in the United Kingdom does not rise to the level of a "clear showing" that enforcing the clause would be unreasonable or unjust. See Roby v. Corporation of Lloyd's, 996 F.2d 1353, 1363-65 (2d Cir. 1993).

As an alternative argument, Nippon Express contends the Bill of Lading is ambiguous with respect to choice of law and choice of forum. First, it argues there is ambiguity because the Bill of Lading provides that the rights and obligations of the parties with regard to cargo damage shall be governed by COGSA while, at the same time, providing for English law to apply. Section 7(A)(2) of the Bill of Lading states: "Notwithstanding anything contained in the preceding provision, in the event that this Bill of Lading covers shipments to or from the United States, than [sic] . . . COGSA shall be compulsorily applicable . . . ." That provision and the English choice of law provision, however, are not mutually exclusive and create no ambiguity because the choice of law provision makes clear that English law applies to disputes under the Bill of Lading "[e]xcept as otherwise specifically provided herein . . ." (Bill of Lading, ¶ 26.)

14

This means English law applies to the extent it is not specifically displaced by other Bill of Lading provisions, such as the one requiring U.S. COGSA to apply in the context of cargo damage or loss. See M/V Jaami, 2007 WL 1040347 at *2 (bill of lading not ambiguous even though forum selection and choice of law clause provide for Japanese law "except as otherwise provided herein" while another provision requires application of COGSA).

Nippon Express also points to section 7(E) of the Bill of Lading which states: "In the event the Carriage covered by this Bill of Lading is subject to two or more compulsory national laws, then the national law of the jurisdiction in which any action is brought shall be applicable." (Bill of Lading, § 7(E).) Nippon Express contends this creates ambiguity because it attempts to ensure that any forum selected will only be interpreting its country's own law in contradiction to the mandatory London forum selection clause and the call for U.S. COGSA to apply to cargo loss or damage. Under these facts, however, section 7(E) is not even implicated as the Bill of Lading is not subject to two compulsory national laws. The English counterpart of COGSA (known as the "Hague-Visby Rules") is likely inapplicable because it is compulsory only where the port where the shipment was loaded or the place where the Bill of Lading was issued is in a country that has adopted the Hague-Visby Rule, or where the Bill of Lading chooses the Hague-Visby Rules as the law governing cargo damage or loss. See The Carriage of Goods by Sea Act 1971 [of England] (1971 c. 19 at 1-2) available at http://www.opsi.gov.uk/acts/acts1971/pdf/ukpga_19710019_en.pdf. Thus, the conditions requiring compulsory application of Hague-Visby Rules are seemingly lacking where the cargo was loaded in the United States and the Bill of Lading specifically deems U.S.

15

COGSA applies to cargo claims. I note here that there is no reason to doubt the ability of English courts to apply U.S. COGSA because the Hague-Visby Rules are substantially similar to U.S. COGSA. <u>See</u> <u>Reed & Barton Corp. v. M.V. Tokio Exp.</u>, 98 Civ. 1079 (LAP), 1999 WL 92608, *3 (S.D.N.Y. Feb. 22, 1999) (noting Hague-Visby Rules are "fraternal equivalent" of U.S. COGSA). Moreover, "[n]othing [in COGSA] . . . suggests that the statute prevents the parties from agreeing to enforce [the rights and duties imposed by COGSA] in a particular forum." <u>Vimar Seguros y Reaseguros, S.A. v. M/V</u> <u>Sky Reefer</u>, 515 U.S. 528, 535 (1995). Nippon Express's ambiguity arguments are without merit.

III.   <u>Conclusion</u>

For all the foregoing reasons, Yang Ming's motion to dismiss is granted.


SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       December 13, 2007