UNITED STATES DISTRICT COURT   ECF

SOUTHERN DISTRICT OF NEW YORK  07 CV 2889 (AKH)

| |
|---|
| ROYAL & SUN ALLIANCE INSURANCE, PLC,<br><br>         Plaintiff,<br>   -vs-<br><br>OCEAN WORLD LINES,<br><br>  Defendant & Third Party Plaintiff,<br><br>      vs.<br><br>YANGMING MARINE TRANSPORT CORP. and DJURIC TRUCKING, INC.,<br><br>    Third Party Defendants. |

THIRD PARTY DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION TO:

1. DISMISS THE CLAIMS AGAINST THEM ON GROUNDS OF A MANDATORY AND EXCLUSIVE FOREIGN FORUM SELECTION CLAUSE, OR

2. DISMISS THE CLAIMS AGAINST DJURIC ON GROUNDS OF A COVENANT NOT TO SUE, OR

3. LIMIT THEIR LIABILITY, IF ANY, TO $500 PER PACKAGE

        CICHANOWICZ CALLAN KEANE VENGROW & TEXTOR, LLP
        61 Broadway 3000
        New York, NY 10006
        (212) 344-7042
        Attorneys for Third Party Defendants

TABLE OF CONTENTS

*Page*

1           INTRODUCTORY STATEMENT

6           ARGUMENT

6           A.    YMTC IS NOT GOVERNED BY CARMACK

10          B.    DJURIC CONTRACTED OUT OF CARMACK

11                *1. The OWL / YMTC Special Agreement*

12                *2. The YMTC / DJURIC Special Agreement*

13          C.    LIMITATION OF LIABILITY

15          D.    NO ADVERSE INFERENCE

15          CONCLUSION

## INTRODUCTORY STATEMENT

This reply memorandum is submitted on behalf of the third party defendants' motion to dismiss or limit liability.

As explained in our moving memorandum, the approach urged by plaintiff would put ocean carriers in international trade in an impossible situation.  We start with the proposition - already accepted by the Courts - that ocean carrier limitations of liability benefit the shipping industry as a whole and promote efficiency and lower costs.  *See, YMTC's and DJURIC's Mov. Mem., pp. 22 – 24.* [1]  Less than a fraction of 1% of the cargo that moves in international commerce suffers any loss or damage. [2]  The rest arrives at its destination without incident.  Eliminating the carrier's limitation of liability would force ocean carriers to raise their rates to cover the added risk.  *Id. at p. 22, n.3.* As to the more than 99% of the cargo that arrives in tact, the result would simply be a needless increase in the costs of transportation.  The higher freight charges would not result in the cargo arriving at its destination any faster or in any better condition.

If we accept, as we must, that ocean carrier limitations of liability are a necessary part of international commerce, then the Court should look askance at any proposed

---

[1]     "In a commercial context, liability limitations have certain advantages. They permit a carrier to avoid unforeseeably high liability for especially valuable cargo; they permit shippers of ordinary items to pay somewhat lower freight bills; and they permit shippers of valuable items to choose between paying an insurance premium to the carrier and obtaining, perhaps less expensive, insurance than their own." *Martino, S.A. v. Transgroup Express,* 269 F.Supp.2d 448, 449 (S.D.N.Y. 2003).

[2]     See, THE MARITIME LAW ASS'N OF THE U.S., Spring Meeting – May 3, 1996, Doc. No. 723, p. 10878  ("Sea-Land [an ocean carrier] issues about 1.3 million bills of lading in a year.  Of these, about 12,000 result in claims for loss or damage … .") (*Reply Exhibit OO*)  [Bracketed text is ours].

liability regime which would, as a practical matter, make it impossible for the ocean and land carriers to limit liability.  See,  *I.N.A. v. S/S AM. ARGOSY,* 732 F.2d 299, 304 (2d Cir. 1984).  The problem with plaintiff's position is that it would do exactly that.  As the U.S. Supreme Court observed in *Kirby*, cargo carried in international commerce moves through many hands.  Between the original shipper and the ultimate consignee, there may be one or more transportation intermediaries (e.g., freight forwarders, NVOCCs, etc.), [**3**] ocean carriers, and land carriers (trucks, railroads).  *Norfolk Southern Railway Co. v. Kirby,* 543 U.S. 14, 34 – 35 (2004).   No one participant in the carriage is in direct contact or direct privity of contract with all the other participants.  *Id.*  To the contrary, transportation intermediaries such as NVOCCs often hide the identity of their shipper/customers as a way of protecting their client base.  *Id.;*  see also, *Jarvis,* ""Expanding the Carrier's Right to Indemnity Under Section 3(5) of COGSA," 24 DUQUESNE L. REV. 811, 826 (n.52) (1986) ("… middlemen hide the identities of their suppliers by listing themselves as shipper … .")

A liability regime which requires, *in advance of shipment*, that the initial shipper be given actual notice of the terms of a downstream ocean or land carrier's standard terms and conditions of carriage, and an opportunity to opt in or out of the Carmack liability regime, imposes impossible conditions.  Neither an original shipper in a foreign country, nor a downstream ocean or land carrier will even know of the other's identity, much less know that the carriers will be called upon to participate in the movement of the shipper's cargo.  Moreover, the land carrier never deals with the original shipper or even the

---

[3]        Defined at 46 U.S.C. 40102(16, 18, 19).

transportation intermediaries. Its dealings and its contract are with the ocean carrier - usually under a private contract between the two of them for the land movement of all cargo which the ocean carrier has undertaken to move through that inland transportation corridor. *See, Supp'l Decl. of CRIBARI, paras. 2 – 4.*

The problem is further complicated by the fact that no ocean carrier can afford to contract with a land carrier for Carmack terms unless it can be certain that all the original shippers will also opt for Carmack terms. The higher liability standards of the Carmack Amendment mean that the ocean carrier would have to pay a substantially higher freight charge to the land carrier; and if the original shipper opts for a lower Carmack-free freight rate, the carrier would end up paying far more in freight charges to the land carrier than it collects from the cargo side of the transaction.

There is still another complication - one recognized by the Supreme Court in *Kirby* and noted in our main brief. Transactions become more complicated and thus more expensive when more than one liability regime applies. A liability regime which allows for an effective contractual extension of COGSA to all participants in the domestic land leg of an international intermodal shipment leads to greater certainty in the assessment and allocation of risk, and a decrease in the potential for litigation and the ultimate costs of the transaction. *YMTC's and DJURIC's Mov. Mem., pp. 18 – 21.*

In *Kirby*, the Supreme Court found a way to affirm existing industry practice. To promote uniformity of law, it expanded admiralty and maritime jurisdiction beyond what it had previously been thought to be. *Kirby,* supra, at 22 - 30. Although the parties in *Kirby* had not initially briefed the issue, the Supreme Court in *Kirby* called for briefing on the extent to which state law would govern (and the Court determined it did not). *Crowley*, "The Limited Scope of the Cargo Liability Regime Covering Carriage of Goods by Sea:

3

The Multimodal Problem," 79 TUL.L.REV. 1461, 1491 (2005). [4]  Although the applicability

of the Carmack Amendment was referred to during oral argument [see, *Norfolk Southern*

*Ry. Co. v. Kirby,* 2004 WL 2348277 (2004)] [5] - and one presumes the Supreme Court was

aware of the statute's potential applicability in any case since it was clearly an interstate

and intermodal movement by rail - the *Kirby* Court called for no briefing on it and

assigned it no role in the expanded maritime liability regime the Court created.

        The notion that the U.S. Supreme Court in *Kirby* did not address Carmack

because the petitioner failed to raise it defies belief given that petitioner had not raised

state law, either.  It also leads to a paradox.  Under the so-called "continuation of foreign

commerce rule" relied upon by the Second Circuit, Carmack applies to the domestic

inland leg of all U.S. import shipments even if the domestic leg is entirely intra-state.

*Sompo Japan Ins. Co. of Am. v. Union Pacific R.R. Co.,* 456 F.3d 54,  61 – 62 (2d Cir.

2006).  Applying that principle, *Kirby's* default rules on allocation of risk on the domestic

leg of intermodal import shipments would never apply to a single case – since all such

movements would be covered by Carmack - and the *Kirby* decision would thus stand as

useless precedent on that issue with no practical applicability to anyone else.  The

Supreme Court does not sit to resolve issues that have importance to no one beyond the

parties to the case.  *Magnum Import Co. v. Coty,* 262 U.S. 159,  163 – 64 (1923)

---

4        "On September 24, 2004, almost three months after receiving the parties' final
briefs on the merits, and only twelve days prior to oral argument, the Supreme
Court directed the parties and invited the Solicitor General to file supplemental
briefs addressing the following question: 'Does federal or state substantive law
govern the questions presented?'"

5        "MR. HUNGAR: ***   Whether higher or lower is unclear but--because in that
circumstance, the--depending on the terms of the-- of the contract between the--
the railroad and the shipper, it might have been subject to the Carmack
Amendment which provides a different liability limitation regime—"

(Certiorari not conferred merely to give defeated party another hearing, but to secure uniformity of decision and to bring up cases of importance, which it is in the public interest to have decided).  In fact, as the *Kirby* decision itself explains, its whole purpose was to establish default rules for the maritime industry as to risk allocation and the rights and obligations of the parties to intermodal carriage over land.  *Kirby,* supra at 36.  There is no reason to suppose that the Supreme Court would disregard a vital component of that equation (i.e., the Carmack Amendment) simply because the parties failed to raise it.  To the contrary, the Supreme Court, sua sponte, asked the parties to brief the applicability of state law, even though the parties had not raised that issue either.

We recognize that this Court is bound by the Second Circuit's decision in *Sompo* to the extent this case cannot be distinguished.  We believe, as explained in our main brief and below, that we can distinguish *Sompo.*  In any event, arguments in derogation of *Sompo* are made to preserve our rights to raise them on appeal to the Second Circuit, and if certiorari is granted, to the Supreme Court.

Plaintiff has objected to the absence of a Rule 56.1 statement.  However, YMTC and DJURIC did not move under Rule 56.  Their motion is made pursuant to Rule 12.  The notice of motion specifies Rule 12(b)(6) for the forum motion which is proper.  *Evolution Online Systems, Inc. v. Koninklijke PTT Nederland N.V.,* 145 F.3d 505, 508 (n.6) (2d Cir. 1998).  The alternative motions to enforce the sea waybill's provision not to sue subcontractors and to limit liability were made pursuant to Rule 12(c) although that Rule was inadvertently not designated in the notice of motion.  That  Rule is also proper.  *Underwood Cotton Co., Inc. v. Hyundai Merchant Marine (American), Inc.,* 288 F.3d 405, 407 (9th Cir. 2002) (Using Rule 12(c) to enforce COGSA one year time bar defense).

Plaintiff has also objected to the use of an attorney's declaration.  However, there is no blanket prohibition against use of an attorney's affidavit on a Rule 12 motion. *Raskin v. Compania de Vapores Realma, S. P.,* 521 F.Supp. 337, 339 (S.D.N.Y. 1981). This is especially true where, as here, the attorney's declaration is made on personal knowledge [F.R.Evid. 602] or merely marshals the evidence.  *See, Mov. Decl. of KEANE, para. 1.*

ARGUMENT

A.    YMTC IS NOT GOVERNED BY CARMACK

The Second Circuit's decision in *Sompo* did not involve an ocean carrier, only a rail carrier.  *Sompo* did not say that an ocean carrier could not avail itself of a contractual extension of COGSA inland, only that the wording of the particular bill of lading at issue was not sufficient to extend the benefit of the bill to a railroad/subcontractor.  There was no dispute in *Sompo* that rail carriers are subject to the Carmack Amendment.

However, YMTC is not a rail or motor carrier, nor is it subject to the jurisdiction of the Surface Transportation Board which has jurisdiction over land carriers.  YMTC is an ocean carrier and is subject to the jurisdiction of the Federal Maritime Commission which also oversees rates for through carriage. 46 U.S.C. 40102(24 – 25) formerly codified at 46 U.S.C.App. 1702(23 – 24); see also, 46 C.F.R. 520.4(j).   The Second Circuit made no determination in *Sompo* that ocean carriers were subject to Carmack. See, *Rexroth Hydraudyne B.V. v. Ocean World Lines, Inc.,* 2007 WL 541958, *2 (S.D.N.Y.) (*Sompo* sheds no light on whether non-rail carrier can limit liability under ocean bill of lading for loss during land portion of intermodal shipment).

6

In *King Ocean Cent. America, S.A. v. Precision Cutting Services, Inc.,* 717 So.2d 507, 512 - 13 (Fla. 1998) cert. den. 526 U.S. 1004 (1999), the Florida Supreme Court reviewed the statute and determined that an ocean carrier's liability was not contemplated or covered by Carmack.  The Florida Supreme Court noted in that Carmack explicitly excludes water carriers from its coverage - their liability being governed by their bills of lading and the law applicable to water transportation.  *Id.;* 49 U.S.C. 14706(c)(2).  The Surface Transportation Board considers a "water carrier" to be an ocean carrier.  See, "Exemption Of Freight Forwarders In The Noncontiguous Domestic Trade From Rate Reasonableness And Tariff Filing Requirements," n.3 (Docket Number:  EP_598_0) (STB 1997) ("A 'water carrier' under the ICCTA is known as a 'vessel operating common carrier' (VOCC) in FMC parlance.") (**ADDENDUM 4**). [<sup>6</sup>]

A review of the statute's wording leads to the unavoidable conclusion that the Florida Supreme Court and the Surface Transportation Board are correct.   The Carmack Amendment provides in relevant part:

> (1) **Motor carriers and freight forwarders.**--A carrier providing transportation or service subject to jurisdiction under *subchapter I or III of chapter 135* shall issue a receipt or bill of lading for property it receives for transportation under this part. That carrier and any other carrier that delivers the property and is providing transportation or service subject to jurisdiction under *subchapter I or III of chapter 135* or chapter 105 are liable to the person entitled to recover under the receipt or bill of lading.

49 U.S.C. 14706(a)(1) (Emphasis added).  Several things are noteworthy about the statute:

---

<sup>6</sup>      See, 46 U.S.C. 40102(6, 17).  The Surface Transportation Board decision is from its web site at http://www.stb.dot.gov/.  Reference in the STB decision to the "ICCTA" is to the Interstate Commerce Commission Termination Act.  *Zatz v. U.S.,* 149 F.3d 144, 147 (2nd Cir. 1998).

     (a)      It is entitled "Motor carriers and freight forwarders" which presumably defines the class to which it applies.

     (b)      The statute refers to two classes of carriers – the receiving carrier and the delivering carrier.  In both cases, the carrier must be subject to jurisdiction under subchapter I or III of chapter 135 or chapter 105.

Chapter 105 applies to railroads and so is inapplicable here.  See, 49 U.S.C. 10501.  To determine whether a carrier is subject to jurisdiction under subchapter I or III of chapter 135, we look to 49 U.S.C. 13501(1) which provides in relevant part:

> The Secretary and the Board have jurisdiction, as specified in this part, over transportation by motor carrier and the procurement of that transportation, to the extent that passengers, property, or both, are transported by motor carrier--
>
> **(1)** between a place in-- * * *
>
> **(E)** the United States and a place in a foreign country to the extent the transportation is in the United States … .

Notice that the jurisdiction of the "Board" (i.e., the Surface Transportation Board) comprises two elements.  One is the nature of the shipment (i.e., the U.S. leg of a shipment between the U.S. and a place in a foreign country).  The other is the nature of the carrier (i.e., that it be a "motor carrier").  Notice also that the statute twice uses the phrase "to the extent that" which indicates that the grant of jurisdiction is narrow rather than broad.

Thus, by the clear wording of the statute, it is impossible to see how an ocean carrier can be subject to the jurisdiction of the Surface Transportation Board or the coverage of the Carmack Amendment.

Plaintiff relies for the opposite proposition on several cases, all of them distinguishable:

- First are *Kyodo U.S.A. Inc. v. Cosco No. Am. Inc.,* 2001 WL 11835158, *4 - 6 (C.D. Cal.) and *Canon USA Inc. v. Nippon Liner Sys., Ltd.,* 1992 WL 82509, *6 - 8 (N.D.Ill.).  However, in those cases, the courts looked only to the nature of the shipments and ignored the water carrier exception and the jurisdictional requirement as to the nature of the land carrier.  Moreover, in *Canon*, the ocean carrier had failed to contractually extend COGSA's coverage beyond the discharge port.  *Id.* at 2 - 3.  That is not so here.

- Plaintiff also cites the Second Circuit's decision in *Project Hope*.  *Project Hope v. M/V IBN SINA,* 250 F.3d 67, 72 (n.7) (2d Cir. 2001).  However, *Project Hope* did not address the applicability of Carmack to an ocean carrier.  *Id.* at 73 (n.5).

- Finally, plaintiff cites to *Cordis Dow Corp. v. S.S. PRES. KENNEDY,* 1985 A.M.C. 2756 (N.D.Cal. 1984).  However in that case, the ocean carrier was held liable under Carmack because it failed to file a claim with the inland carrier as the ocean carrier's own bill of lading required it to do - also not the case here.

Contrary to plaintiff's contention, the YMTC bill of lading calls for application of the Carmack Amendment only if the contractual extension of COGSA is inapplicable.  *See, Mov. EXHIBIT FF, cl. 7(2)(B).*  We submit that is also not the case here.

In addition to the foregoing, YMTC can avoid Carmack's applicability on any grounds that DJURIC is able to avoid it, too.

B.    DJURIC CONTRACTED OUT OF CARMACK

In its opposing papers, plaintiff raises no issue as to the manifest intent of the YMTC bill of lading that DJURIC have the benefit of its defenses.  Plaintiff's only ground for opposition is that the language is insufficient under *Sompo*.  However, plaintiff fails to address an important point which distinguishes the *Sompo* case from the one at bar.  In *Sompo,* there were no specially negotiated private agreements in place as there were here between YMTC and its shipper (defendant & third party plaintiff, OWL) and between YMTC and its trucker, DJURIC.  *See, YMTC's and DJURIC's Mov. Mem., pp. 14 – 17.*

The Second Circuit held in *Sompo* that:

> …  the MOL bills of lading do not satisfy the Staggers requirement that the shipper be given an opportunity to receive full Carmack liability coverage before accepting alternative terms.

*Id.* at 76.   As plaintiff points out, bills of lading are boilerplate contracts. *Pltff's Opp. Mem., 2 (n.2).*  An ocean common carrier is forbidden by law from varying the terms and conditions of bills of lading between and among shippers similarly situated.  46 U.S.C. 41104.    Thus, the Second Circuit could not assume that the *Sompo* bill of lading was the product of any negotiations that gave the shipper the right to choose between different types of liability coverage.  *Sompo,* supra at 76.

### 1. The OWL / YMTC Special Agreement

However, in this case, the sea waybill contract between OWL and YMTC was pursuant to a privately negotiated Service Contract between the two. *Mov. EXHIBIT JJ.* Service Contracts have been deemed the equivalent of a private charter party contract of carriage in which the parties can and do change the ocean carrier's statutory liability – often increasing it. *See, YMTC's and DJURIC's Mov. Mem., p. 16.* Unlike the parties to a bill of lading or sea waybill, the parties to such a privately negotiated agreement are considered to have equivalent bargaining power. *Associated Metals & Minerals Corp. v. S/S Jasmine,* 983 F.2d 410, 412 (2d Cir. 1993).

The YMTC / OWL Service Contract incorporates the YMTC sea waybill by reference, which means that the two must be read as one agreement. *Mov. EXHIBIT JJ, Term 12; Volgotanker Joint Stock Co. v. Vinmar Intern. Ltd.,* 2003 WL 23018798, *6 (S.D.N.Y.). The YMTC sea waybill explicitly provides that carriage of plaintiff's cargo was pursuant to the terms and conditions of the bill which provides that it supersedes any "privilege to [the] contrary." [7] The bill provides that U.S. COGSA shall govern throughout the carriage, that London shall be the exclusive forum for resolution of disputes, that the carrier's liability shall be limited to $500 per package, and that the shipper shall not sue YMTC's subcontractors. See, *Regal-Beloit Corp. v. Kawasaki Kisen Kaisha, Ltd.,* 2006 WL 3411535, *5 (C.D.Cal.) (Rejecting applicability of Carmack to bar enforcement of Japanese forum clause where parties had specially contracted for the forum clause).

---

[7]        A "privilege" is a special right.  BLACK's LAW DICTIONARY, 1197 (6th ed. 1991).

### 2. The YMTC / DJURIC Special Agreement

DJURIC's supplemental declaration of Richard Cribari points out that all shipments it has handled for YMTC over the past 10 years have been pursuant to a private rate agreement and not subject to DJURIC's tariff, which has been DJURIC's practice with all it customers. *Supp'l Decl. of CRIBARI, paras. 2 – 4; see also, Mov. EXHIBIT KK.* The YMTC sea waybill issued to OWL makes the private YMTC / DJURIC agreement part of the sea waybill contract. Clause 7(2)(B) provides in relevant part:

> In the event there is a private contract of Carriage between the Carrier and any Underlying Carrier, such Multimodal transportation will [*sic*] governed by the terms and conditions of said contract which shall be incorporated herein as if set forth at length.

*Mov. EXHIBIT FF.* That means that the YMTC / DJURIC rate agreement [Mov. EXHIBIT KK] must be read together with the sea waybill as one agreement. See, *Volgotanker,* supra.

### 3. Contracting out of Carmack

Carmack Amendment allows the parties to an inland motor carrier move to contract out of its coverage. It provides in relevant part:

> A carrier providing transportation or service subject to jurisdiction under chapter 135 may enter into a contract with a shipper, other than for the movement of household goods described in section 13102(10)(A), to provide specified services under specified rates and conditions. If the shipper and carrier, in writing, expressly waive any or all rights and remedies under this part for the transportation covered by the contract, the transportation provided under the contract shall not be subject to the waived rights and remedies and may not be subsequently challenged on the ground that it violates the waived rights and remedies.

49 U.S.C. 14101(b)(1). To effect a waiver of Carmack rights and remedies, it is not necessary that the statute be referred to by name. *Consolidated Freightways Corp. of*

*Delaware v. Travelers Ins. Co.,* 2003 WL 22159468, *3 (N.D.Cal.).Where a *privately negotiated agreement* (as opposed to a carrier's boilerplate contract of adhesion) is specific as to the liability to be imposed, it is effective under section 14101(b)(1) to take the case out of Carmack's coverage.  *Id.* at *3 – 4.  That is the case here.

Plaintiff relies on the Second Circuit's decision in *Aacon Auto Transp. v. State Farm* for the proposition that forum selection clauses are unenforceable under Carmack. *Kyodo U.S.A., Inc. v. Cosco North America Inc.,* 2001 WL 1835158, *6 (C.D.Cal.) citing *Aacon,* supra, 537 F.2d 648, 654 (2d Cir. 1976).  However, *Aacon* invalidated forum clauses under Carmack reasoning that they qualified as unauthorized limitations of liability.  *Id.*  However, that rationale has been invalidated by the U.S. Supreme Court which has held that forum clauses are not limitations of liability.  *Vimar Seguros y Reaseguros, S.A. v. M/V SKY REEFER,* 515 U.S. 528, 534 – 37 (1995).

Plaintiff takes the position that the YMTC sea waybill forum clause is inapplicable because the DJURIC rate agreement which covers the move contains no forum provision.  However, the effect of sea waybill clause 7(2)(B) discussed above is by its wording not to replace the sea waybill with the DJURIC rate agreement, but to make the two part of one contract.  Since the YMTC sea waybill applies "Except as otherwise specifically provided herein,' and since the DJURIC rate agreement contains nothing to specifically contradict it, the forum clause governs.

## C.    LIMITATION OF LIABILITY

In the event the forum clause is denied, or the Carmack Amendment is held applicable, the third party defendants so affected move in the alternative to limit their

liability, if any, to $500 per package and incorporate by reference the arguments advanced in that respect by defendant & third party plaintiff, OWL.

Since *filed* tariffs are no longer required under the Carmack Amendment, it is the shipper's burden to request a copy of the motor carrier's tariff. *Conti-Harding v. Eden Relocation, Inc.,* 2007 WL 1136092, *3 (E.D. Tex.). DJURIC's supplemental declaration is clear that it does maintain a tariff, but that the tariff was not used for this or any of its other YMTC shipments. *Supp'l Decl. of CRIBARI, para. 4.* Plaintiff has not shown that DJURIC ever failed to provide a copy of that tariff upon request. Therefore, to limit liability under Carmack, it is only necessary that motor carrier limitations of liability be:

> … set forth in a "reasonably communicative" form in the contract so as to result in a "fair, open, just and reasonable agreement" between the carrier and shipper, and [that] the contract offers the shipper a possibility of higher recovery by paying the carrier a higher rate.

*Martino,* supra, 269 F.Supp.2d at 449. That is certainly the case here. The Service Contract between YMTC and OWL was freely negotiated and the sea waybill contract by its terms gave the shipper [OWL] the option of declaring a higher value. *Mov. EXHIBIT FF, cl. 23(3 – 4).* We submit that a $500 per package limitation of liability is per se reasonable since the liability is provided for in a federal statute governing ocean carriers. 46 U.S.C. 30701, STATUTORY & HISTORICAL NOTES, Section 4(5). See, *Transatlantic Marine Claims Agency, Inc. v. M/V OOCL Inspiration,* 137 F.3d 94, 103 (2d Cir. 1998) (Tariff, which incorporates the $500 per package limitation of COGSA, is eminently reasonable).

D.    NO ADVERSE INFERENCE

Plaintiff argues that the failure to put the DJURIC tariff into evidence should give rise to an adverse inference. *Pltff's Opp. Mem., pp. 6 (n.5), 7.*  We disagree.  To be entitled to an adverse inference, plaintiff must show that the DJURIC tariff is relevant. *Residential Funding Corp. v. Degeorge Financial Corp.,* 306 F.3d 99, 107 (2d Cir. 2002).  Plaintiff cannot do so for two reasons:  (1) neither the subject movement, nor any other movement DJURIC has made for YMTC in the past 10 years has been pursuant to a tariff, and (2) in any case, the DJURIC tariff contains only rates, no rules or regulations. *Supp'l Decl. of CRIBARI, paras. 2 – 4..*

CONCLUSION

The motion should be granted.

Dated:        New York, NY              *Respectfully submitted,*

              January 30, 2008          CICHANOWICZ CALLAN KEANE
                                        VENGROW & TEXTOR, LLP
                                        61 Broadway 3000, New York, NY 10006
                                        212-344-7042
                                        Attorneys for Third Party Defendants

                                        By: /s/ _____Paul M. Keane_____
                                              PAUL M. KEANE [PK-5934]

*Of Counsel:*

        JOSEPH De MAY, JR.

# ADDENDUM 4

21543      SERVICE DATE - LATE RELEASE FEBRUARY 21, 1997
EB

       This decision will be included in the bound volumes of printed
                      reports at a later date.

                  SURFACE TRANSPORTATION BOARD

                          DECISION

                       49 CFR Part 1319

                    STB Ex Parte No. 598

           EXEMPTION OF FREIGHT FORWARDERS IN THE
      NONCONTIGUOUS DOMESTIC TRADE FROM RATE REASONABLENESS
                AND TARIFF FILING REQUIREMENTS

AGENCY:  Surface Transportation Board.

ACTION:  Final Rules.

SUMMARY:  The Board exempts freight forwarders in the
noncontiguous domestic trade from tariff filing requirements.
This action eliminates an unnecessary regulatory burden and
should provide freight forwarders with additional flexibility to
meet the needs of their customers.

EFFECTIVE DATE:  These rules are effective March 30, 1997.

FOR FURTHER INFORMATION CONTACT:  James W. Greene, (202) 927-
5612.  [TDD for the hearing impaired:  (202) 927-5721.]

SUPPLEMENTARY INFORMATION:  In a notice of proposed rulemaking
(Notice) served November 20, 1996 (61 FR 59075), the Board
requested comments on whether to exempt freight forwarders from
rate reasonableness and tariff filing requirements in the
noncontiguous domestic trade, pursuant to 49 U.S.C. 13541.  Under
section 13541--enacted by the ICC Termination Act of 1995, Pub.
L. No. 104-88, 109 Stat. 803 (1995) (ICCTA)--the Board is
directed to exempt a person or class of persons from an otherwise
applicable statutory provision when it finds:  (1) that the
application of that provision is not necessary to carry out the
transportation policy of 49 U.S.C. 13101; (2) either that the
application of that provision is not needed to protect shippers
from the abuse of market power or that the transportation or
service is of limited scope; and (3) that it is in the public
interest to exempt.

     We received comments in response to the Notice from the
Caribbean Shippers Association, Inc. (CSA), Crowley American
Transport, Inc. (Crowley), Export Transports, Inc. (Export), the
Government of Guam (GovGuam), NPR, Inc. d/b/a Navieras (NPR),
Samuel Shapiro & Company, Inc. (Shapiro), Sea-Land Service, Inc.
(Sea-Land), and the United States Department of Transportation
(DOT).[1]  Two of the commenters (Export and Shapiro) are freight
forwarders, one (CSA) is a shipper, three (Crowley, NPR and Sea-
Land) are water carriers, and two (DOT and GovGuam) are
government entities.  CSA, DOT, Export and Shapiro favor the
proposed exemption, and Sea-Land does not object to it.  Crowley,
NPR and GovGuam oppose the exemption.

---

     [1]  Crowley requested that the time for filing comments be
extended.  An extension until January 21, 1997, was granted in a
decision served January 3, 1997.

STB Ex Parte No. 598

Coverage of the Exemption

Several of the comments reflect some uncertainty or misperception as to the nature and scope of the proposed exemption. Prior to the ICCTA, regulatory authority over the noncontiguous domestic trade[2] was shared by the Federal Maritime Commission (FMC) and the Board's predecessor, the Interstate Commerce Commission (ICC). The FMC had authority over "port-to-port" (all-water) movements, while the ICC had exclusive jurisdiction over "intermodal" (land-water) movements provided under joint rates. The ICCTA transferred responsibility for both types of transportation to the Board.

The FMC and ICC used differing terminology to refer to an entity that, acting as a carrier, consolidates shipments for further movement, and that then uses an underlying carrier for line-haul transportation. The ICC, the ICCTA, and the Notice in this proceeding used the term "freight forwarder" to refer to this type of carrier [49 U.S.C. 13102(3), (8)], while the FMC referred to this type of entity as a "non vessel operating common carrier" (NVOCC). By contrast, what the FMC characterized as a freight forwarder is an entity that can provide services involving transportation by a water carrier[3] similar to those provided by a "broker" involving transportation by a motor carrier. See 49 U.S.C. 13102(2). A freight forwarder, as that term is used here, is equivalent to an NVOCC under FMC regulations. Thus, what the FMC referred to as "freight forwarders" would not be covered by the proposed exemption. Accordingly, CSA's concern that our proposal here is overly broad is misplaced.

NPR suggests that NVOCCs do not function in respect to water transportation as freight forwarders function in respect to land transportation, and as a result, that deregulation of freight forwarders in the motor carrier industry cannot serve as a guide to the deregulation of NVOCCs in the ocean carrier industry. We disagree. Although the term "freight forwarder," as used by the FMC, may refer to a non-carrier, NVOCCs formerly regulated by the FMC do function in the same way as freight forwarders function with respect to land transportation. In each case, the forwarder holds out service as a common carrier; performs consolidation and break-bulk; uses an underlying carrier to perform line-haul transportation; and maintains the dual status of both carrier (vis a vis its shippers) and shipper (vis a vis the underlying carrier that it uses). Moreover, the ICCTA does not establish different requirements for freight forwarders in the noncontiguous domestic trade depending upon whether they utilize an underlying motor and/or water carrier to provide the transportation that they purchase. Thus, we conclude that there is no functional difference between the two.

Basis for the Exemption

---

[2]  The term "noncontiguous domestic trade" means transportation now subject to jurisdiction under 49 U.S.C. Chapter 135 that involves traffic originating in or destined to Alaska, Hawaii, or a territory or possession of the United States.  49 U.S.C. 13102(15).

[3]  A "water carrier" under the ICCTA is known as a "vessel operating common carrier" (VOCC) in FMC parlance.

DOT views as an anachronism the provision of the ICCTA that imposes tariff filing requirements on forwarders in the noncontiguous domestic trade.  As DOT notes, because of the shared regulatory authority over common carriers in the noncontiguous domestic trade prior to the ICCTA, carriers could to a large degree choose the regulatory regime that would apply to their activities simply by choosing to structure their services as either port-to-port or intermodal transportation. The freight forwarders in the noncontiguous domestic trade that were subject to the ICC's jurisdiction have provided transportation since 1986 without being subject to tariff filing requirements.

In addition, DOT points out that all other types of transportation intermediaries are already exempt from tariff filing and rate reasonableness regulation.  DOT argues that forwarding services are highly competitive, that the market is easily entered, that the public interest has been well served during the last 10 years by an approach that did not require any tariff filing by ICC-regulated freight forwarders, and that removal of the tariff filing requirement for noncontiguous domestic trade shipments would enhance competition and transportation efficiency.

Export and CSA also support an exemption.  Export views tariff filing for freight forwarders in the noncontiguous domestic trade as outdated and unnecessary.  CSA agrees that the freight forwarder industry is highly competitive, and argues that the exemption will increase that competitiveness and remove a burdensome administrative cost.

NPR and Crowley express concern that exempting freight forwarders would create an uneven playing field between freight forwarders and water carriers, because freight forwarders would have full knowledge of water carriers' rates in light of the tariff filing requirement, but water carriers would not have similar knowledge of freight forwarders' rates.  However, as Crowley acknowledges, both freight forwarders and water carriers may now enter into contracts under 49 U.S.C. 14101 for transportation to which tariff requirements do not apply.  Thus, water carriers in many cases may not know freight forwarders' rates now.  Moreover, as Sea-Land observes, because water carriers have the same ability to contract, an exemption does not put them into an unfair competitive position.

In examining this argument regarding the eventuality of an uneven playing field, it is important to note that freight forwarders, while performing as carriers vis-a-vis their shippers, must utilize the services of a water carrier, such as Crowley or NPR, to transport the cargo (except for service between Alaska and the lower 48 States, for which a freight forwarder could choose to use the overland services of a motor carrier).[4]  Thus, freight forwarders must also be customers of the water carriers.  Freight forwarders typically consolidate shipments, and they may, therefore, qualify for lower unit rates because of the greater volume.  Nevertheless, the transportation rates paid by freight forwarders are those established by the water carriers; presumably, any lower unit rates paid for the

---

[4]  We have not received any comments directed specifically to the trade between Alaska and the lower 48 States.

larger shipments received from freight forwarders reflect the lower unit costs or other advantages to the water carriers associated with such larger shipments. We do not believe that an exemption will, in and of itself, divert traffic from existing water carriers as a result of the uneven playing field that NPR and Crowley claim will result from an exemption. See <u>Cent. & Southern Motor Freight Tariff Ass'n v. United States</u>, 757 F.2d 301, 323-24 (D.C. Cir. 1985), cert. denied, 474 U.S. 1019 (1985) (<u>Cent. & Southern</u>) ("the shipper has an incentive to disclose ['secret rates'] to start a bidding war between carriers interested in his business"). But in any event, while there may be some small shipment traffic handled by freight forwarders that would otherwise be handled by NPR and Crowley in small lots, the forwarders themselves will consolidate these small shipments into larger shipments that NPR and Crowley can handle.

Crowley suggests that our proposal to exempt freight forwarders from the tariff filing requirement is based on an unfounded assumption that tariff filing in the noncontiguous domestic trade is likely to end eventually for water carriers also. We make no such assumption. Rather, we note that in the past surface freight forwarders and air freight forwarders were exempted from tariff filing requirements while the underlying motor and air carriers were still required to file tariffs. A differing tariff filing status for freight forwarders and water carriers in the noncontiguous domestic trade is no less appropriate than was a different tariff filing status for surface freight forwarders and motor carriers, or air freight forwarders and air carriers.

Finally, we note that the argument that tariff filing exemptions will upset the existing competitive balance have been raised, and rejected, many times before. See <u>Improvement of TOFC/COFC Regulation</u>, 46 Fed. Reg. 14348, 14349 (Feb. 27, 1981), aff'd, <u>American Trucking Associations v. ICC</u>, 656 F.2d 1115 (5th Cir. 1981); <u>Improvement of TOFC/COFC Regulations</u>, 3 I.C.C.2d 869, 879 (1987); <u>Exemption of Motor Contract Carriers from Tariff Filing Requirements</u>, 133 M.C.C. 150 (1983), aff'd, <u>Cent. & Southern</u>. Nothing on this record suggests that we should take a different approach here.

<u>Breadth of the Exemption</u>

GovGuam does not oppose relieving segments of the domestic offshore freight forwarder industry from tariff filing and rate reasonableness standards, where appropriate; however, it states that such action must be tailored to operative trade conditions. GovGuam indicates that, while there are some large volume domestic offshore trades where many freight forwarders vigorously compete for business, other trades with less cargo volumes may have significantly fewer competitors, to the point where market power in the freight forwarding segment can be attained and abused. GovGuam contends that Guam is such a non-competitive trade.

GovGuam suggests that we undertake an origin/destination-oriented investigation in which freight forwarder tariffs might be required from/to certain origins/destinations in the noncontiguous domestic trade but not others. According to GovGuam, individual domestic offshore trade exemptions "should only be granted in those trades that: (1) evidence a significant number of directly competing freight forwarders; (2) have a

STB Ex Parte No. 598

historical record of a low incidence of rate malpractices; (3)
include only a de minimis amount of cargo not suitable for direct
tendering to underlying ocean water carriers; and (4) have in
place an adequate [Board] program for the regulation of rate
levels of underlying ocean water carriers."

With regard to this argument, we have consulted informally
with FMC staff members regarding noncontiguous domestic trade
tariffs, and they advise us that they are not aware of any
protests or suspension requests relating to freight forwarder
(NVOCC) tariffs in that trade.  Thus, it would appear that any
such proceedings, at least in recent years, have been limited to
water carrier (VOCC) tariffs, which will not be affected by the
exemption.  Similarly, while GovGuam asserts that NVOCC/freight
forwarder "malpractices"[5] in the foreign trades can be
documented, there is no indication from FMC staff that such
practices involve any Guam tariffs that would be affected by the
exemption.

In any event, upon further examination, we conclude that,
while the tariff filing requirement for the noncontiguous
domestic trade would apply to freight forwarders absent this
exemption,[6] the rate reasonableness requirement for water
transportation does not apply to freight forwarders.  Under 49
U.S.C. 13701(a)(1)(B), a rate for a movement **by or with a water
carrier** in noncontiguous domestic trade must be reasonable.  We
interpret this language as embracing only local rates of a water
carrier and joint rates in which a water carrier is a
participant.  Because freight forwarder rates are not subject to
the rate reasonableness requirements of 13701, we would have
little regulatory oversight over those rates, even if tariff
filing continued to be required.

<u>Expansion of the Exemption</u>

CSA suggests that we broaden the exemption to "include motor
carrier initiated rates in the domestic offshore trades."  With
regard to motor carrier "initiated" rates, the only motor carrier
tariffs required to be filed with the Board are those containing
joint rates with water carriers in the noncontiguous domestic
trade.  We do not read the ICCTA as requiring the filing of a
motor carrier tariff where the entire service is held out by the
motor carrier (notwithstanding that some of the service may be
performed by a water carrier under substitute service rules
established by the motor carrier).  As to joint rates with water
carriers, however, the tariff filing requirement is not dependent
upon who "initiates" the rate.[7]  Under 49 U.S.C. 13541(d), we are
precluded from exempting a water carrier from the tariff filing
requirement in the noncontiguous domestic trade, and we read this
prohibition to include both the local and joint rates of a water
carrier.

---

[5]  GovGuam uses the term malpractices to refer to
"overcharges, 'hidden charges,' and 'after the fact' charges."

[6]  See 49 U.S.C. 13702(b)(2)(C) which sets forth specific
requirements for freight forwarder tariffs.

[7]  The term joint rate is defined in 49 CFR 1312.1(b)(8) as
a rate that applies over the lines or routes of two or more
carriers made by an agreement between the carriers, effected by a
concurrence or power of attorney.

STB Ex Parte No. 598

Other Concerns

GovGuam also expresses concern about the restrictions of the Jones Act, the lack of Board financial reporting requirements for water carriers,[8] and certain provisions of the ICCTA that insulate from legal challenge motor and water carrier rate increases of up to 7.5% annually; allow carriers to enter into confidential transportation contracts; exempt certain commodities from tariff filing requirements; and provide no mechanism for the suspension of proposed rate increases. As GovGuam indicates, certain of these issues may be addressed in the noncontiguous domestic trade study mandated by section 407 of the ICCTA, and others can be addressed in other forums; however, we do not believe that these concerns are closely related to whether freight forwarders should be required to file tariffs. Thus, they will not be addressed in this proceeding.

Conclusion

As indicated in the Notice, the noncontiguous domestic trade freight forwarder industry is highly competitive, and any person meeting basic fitness and financial responsibility requirements can become a freight forwarder and provide service to the public. Elimination of the tariff filing requirement will eliminate an unnecessary burden. To the extent that the exemption affects the rates and services offered to the public, we expect that the reduced burden will result in lower rates and additional competition. Additionally, as also noted in the Notice, water carrier services will continue to be available at tariff rates to both forwarder and non-forwarder shippers, and section 13701 of the ICCTA requires that those rates be reasonable.

We conclude that the tariff filing requirement for freight forwarders in the noncontiguous domestic trade is not necessary to carry out the transportation policy of 49 U.S.C. 13101 or protect shippers from the abuse of market power, and that the elimination of that requirement would be in the public interest. We will, therefore, grant the exemption and adopt the regulations set forth below.

**Small Entities**

The Board certifies that this rule will not have a significant economic effect on a substantial number of small entities. The rule removes an unnecessary regulatory burden and, to the extent that it affects small entities, the effect should be favorable.

**Environment**

This action will not significantly affect either the quality of the human environment or the conservation of energy resources.

**List of Subjects in 49 CFR Part 1319**

Exemptions, Freight forwarders, Tariffs.

---

[8] We note, in this connection, that the financial reporting requirements imposed by the FMC in the noncontiguous domestic trade were limited to VOCCs; no such requirements were imposed on NVOCCs.

STB Ex Parte No. 598

Decided:  February 13, 1997.

By the Board, Chairman Morgan and Vice Chairman Owen.


Vernon A. Williams
Secretary

For the reasons set forth in the preamble, the Board adds a new part 1319 to title 49, chapter X, of the Code of Federal Regulations to read as follows:

**PART 1319 - EXEMPTIONS**

Sec.

1319.1    Exemption of freight forwarders in the noncontiguous domestic trade from tariff filing requirements.

   **Authority:**  49 U.S.C. 721(a) and 13541.

**§ 1319.1   Exemption of freight forwarders in the noncontiguous domestic trade from tariff filing requirements.**

   Freight forwarders subject to the Board's jurisdiction under 49 U.S.C. 13531 are exempted from the tariff filing requirements of 49 U.S.C. 13702.