UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------- x
ROYAL & SUN ALLIANCE INSURANCE    :
PLC,                                          :
                                            :
                   Plaintiff,    :
       -against-                    :
                                            :
OCEAN WORLD LINES, INC.,         :    **OPINION AND ORDER**
                                          :    **GRANTING PACKAGE**
                   Defendant.  :    **LIMITATIONS ON LIABILITY**
                                          :
                                          :    07 Civ. 2889 (AKH)
-------------------------------------------------------- x
OCEAN WORLD LINES, INC.,         :
                                          :
               Third-Party Plaintiff, :
       -against-                    :
                                            :
YANG MING MARINE TRANSPORT CORP. :
and DJURIC TRUCKING, INC.         :
                                          :
               Third-Party Defendants.  :
-------------------------------------------------------- x

ALVIN HELLERSTEIN, U.S.D.J:

        Who bears the onus, and what is the measure of liability, when a shipment

of goods, transported by ship, rail and truck from a port in Germany to an inland

destination in the United States, is damaged during the last leg of the voyage when the

truck carrying the goods crashes into a highway overpass? That is the topic of this

opinion. And its discussion travels its own voyage, through two bills of lading, different

statutory schemes — the Carriage of Goods by Sea Act, 46 U.S.C. § 30701 et seq., and

the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C. § 14706 —

inconsistent Supreme Court and Second Circuit interpretations of the statutory schemes,

and varying other case interpretations.

The protagonists of this story are: the exporter and shipper of seven packages of printing equipment, exported from Bremerhaven, Germany and sold to a consignee in Bourbon, Indiana; the insurer of the shipper who, by paying the shipper's claim, became subrogated to its rights; the non-vessel operating common carrier ("NVOCC") that issued a bill of lading to the exporter, promising delivery to the consignee via shipping and carriage that the NVOCC would arrange; the vessel owner that agreed to ship the cargo to Norfolk, Virginia, and to arrange further inland transportation via rail and truck to the consignee, all under its own sea waybill issued to the NVOCC; and, finally, the trucking company that the vessel owner engaged to truck the printers from the railhead in Chicago to the final destination in Bourbon, Indiana. The parties, by full name and short form are:

1. The Exporter and Shipper: White Horse Machinery Ltd. ("White Horse");
2. The Insurer and Subrogee: Royal & Sun Alliance Insurance PLC ("Royal & Sun")
3. The NVOCC: Ocean World lines, Inc. ("OWL");
4. The Vessel owner: Yang Ming Transportation Corporation ("Yang Ming"), and
5. The Trucking company: Djuric Trucking, Inc. ("Djuric").

Plaintiff Royal & Sun filed this action as the subrogated insurer of the shipper White Horse Machinery Ltd. ("White Horse"). It sues defendant OWL, seeking to recover $125,851.38 in damages, the value of the seven packages of printing equipment damaged in transit. OWL denied liability above a $500 package limitation and, impleading Yang Ming and Djuric, filed third-party actions against them alleging that if it (OWL) was liable to Royal & Sun, Yang Ming and Djuric were jointly and severally liable to OWL. Yang Ming and Djuric, appearing by common counsel, denied liability in excess of the $500 package limitation, both to Royal & Sun and to Yang Ming and Djuric.

On December 20, 2007, OWL filed a motion for partial summary judgment, claiming that it could not be liable to Royal & Sun for more than the agreed package limitation, $500 per package, or $3500 for the entire shipment. Yang Ming and Djuric, defending against both OWL and Royal & Sun, claimed that they, also, could not be liable for more than the $500 package limitation. Royal & Sun, in turn, claimed that Yang Ming and Djuric should be liable, jointly and severally with OWL for the full value of the merchandise. Thus, the issue of the package limitation arises under the OWL bill of lading issued by OWL to White Horse, and under the Yang Ming sea waybill issued by Yang Ming to OWL covering the entire sea, rail and truck transportation, including Djuric's truck transportation which caused the damage to the printing equipment.

I heard argument on February 19, 2008 on both Royal & Sun's motion for summary judgment, and on Yang Ming's and Djuric's motion to dismiss OWL's third party complaint. The parties presented affidavits as well as briefs, arguing pro and con as to the package limitation under both OWL's and Yang Ming's bills of lading, thus converting Yang Ming's and Djuric's motion to dismiss into a motion for summary judgment. And, because the parties argued on not only Royal & Sun's claim against OWL and OWL's third-party claim against Yang Ming and Djuric, but also Royal & Sun's claim against Yang Ming and Djuric, I have authority to resolve that claim as well. See Fed. R. Civ. P. Rule 14(a); see also Project Hope v. M/V Ibn Sina, 250 F.3d 67, 76-77 (2d Cir. 2001) (amendment of pleadings "unnecessary if the third-party is effectively on notice that it will be held liable on the plaintiff's claims and the two proceed against one another in an adverse manner").

For the reasons stated in this opinion, I grant OWL's motion for summary judgment against Royal & Sun, limiting OWL's liability to Royal & Sun to $500 per

package, or $3500 for the seven damaged packages.  As limited, I grant OWL's claim for $3500, or $500 for each of the seven packages, against Yang Ming and Djuric, the carriers responsible for the damaged goods.[1]  As between Royal & Sun and Yang Ming and Djuric, I hold that Yang Ming and Djuric also are entitled to the package limitation, and thus not liable to Royal & Sun for the full value of the damaged merchandise.

## A.    Background

In early June 2006, White Horse engaged defendant OWL to arrange to transport a shipment of seven packages of printing equipment from Bremerhaven, Germany, to Bourbon, Indiana.  The bill of lading issued by OWL recited that the packages would be transported by ship from Bremerhaven, Germany to Norfolk, Virginia, by rail from Norfolk to Chicago, Illinois, and by truck from Chicago to the consignee in Bourbon, Indiana.

OWL is a Delaware corporation with its principal place of business in New York and is licensed by the Federal Maritime Commission ("FMC") as a non-vessel operating common carrier ("NVOCC").  OWL does not own or operate ocean vessels or inland methods of transportation.  Rather, it engages with ocean vessel-operating common carriers ("VOCCs") to procure blocks of cargo space at discounts, and they in turn engage rail and truck common carriers for domestic transport.  Under federal regulations, NVOCCs such as OWL are common carriers in relation to shippers, and shippers in relationship to VOCCs.

### 1.  OWL's Bill of Lading and the Carriage of Goods by Sea Act Incorporated into OWL's Bill of Lading

---

[1] Yang Ming does not claim against Djuric.  They are represented by common counsel.

On June 15, 2006, OWL issued its through bill of lading to White Horse, engaging to arrange transportation of all seven packages from Bremerhaven, Germany, to Bourbon, Indiana.[2]   The bill of lading provided that the entire intermodal shipment was to be governed by the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. §§ 30701 et seq., "throughout the entire time during which the Carrier (i.e., OWL) is responsible for the goods," even after the goods were discharged from the ocean-transporting vessel and the ocean voyage was completed, until the goods reached their final destination. Thus, Clause 5(D)(1) of  the bill of lading constituting the contract between OWL and White Horse provided:

> [C]arriage to, from or through a port in the USA, this Bill of Lading shall be subject to COGSA (Carriage of Goods by Sea Act) and extended to apply to all Goods before the goods are loaded on or after they are discharged from the Vessel and throughout the entire time during which the Carrier is responsible for the goods under the Bill of Lading.

COGSA provides for such extensions of its provisions to the over-land portions of intermodal shipments.  Thus, § 30701(7) provides:

> Nothing contained in this chapter  shall prevent a carrier or a shipper from entering into any agreement, stipulation, condition, reservation, or exemption as to the responsibility and liability of the carrier or the ship for the loss or damage to or in connection with the custody and care and handling of goods prior to the loading on and subsequent to the discharge from the ship on which the goods are carried by sea.

Under COGSA, a limitation of liability applies — $500 per package — unless the nature and value of the goods have been separately declared:

---

[2] A combined transport bill of lading provides for carriage both by sea and by land; "combined transport" is synonymous with "intermodal" and "multimodal."   The bill of lading states the terms on which the goods are to be carried.  See T. SCHOENBAUM, 1 ADMIRALTY & MARITIME LAW 619 (4th ed. 2004).

> Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package . . . unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading."

46 U.S.C § 30701(5).   Clause 5(D)(3) of the OWL bill of lading also so provided:

> If COGSA applies then the liability of the Carrier shall not exceed US $500 per package or customary freight unit unless the value of the Goods has been declared on the face hereof with the consent of the Carrier and extra freight has been paid in which case Clause 10 shall apply and the declared value (if higher) shall be substituted for the limit and any partial loss or damage shall be adjusted pro-rata on the basis of such declared value.

OWL and White Horse agreed to the $500 per package limitation.  The agreement was manifested by White Horse's declination to exercise its option to declare the true nature and value of the goods on OWL's bill of lading.  Presumably, White Horse elected to obtain a lower shipping rate for undeclared merchandise, and to insure the merchandise it was shipping independently.  White Horse purchased such independent insurance from plaintiff Royal & Sun.

The bill of lading issued by OWL and signed by White Horse provided that its provisions would protect every other carrier and agent providing services on the carriage of goods, from inception to final destination.  This extension of the provisions of a bill of lading, known in the trade as a Himalaya clause, provided in Clause 7(1):[3]

> Because the Carrier requires the assistance of others to perform the services undertaken under this Bill of Lading as well as transportation agreements between Carrier and others, every servant, agent, stevedore, terminal services contractor, lighter operator, pilot, connecting rail, motor, water, or air carrier or other independent contractor,

---

[3] The origin of clauses extending protections to sub-contractors and underlying carriers comes from an English case involving a steamship named Himalaya.  See Adler v. Dickson, [19550 1 Q.B. 158 (C.A. 1954); see also SCHOENBAUM at 628-29.

> including their agents, servants and subcontractors,
> performing such services shall have the benefit of every
> exemption from and limitation of liability, defense, right
> and liberty to which the Carrier is entitled, under any
> provision of this Bill of Lading or by applicable law . . .

In the OWL bill of lading, OWL also provided the governing law – Untied

States law – and the forum – the United States District Court for the Southern District of

New York – that would resolve disputes. Clause 7 provided:

> Law & Jurisdiction – Whenever COGSA . . . applies by
> virtue of paragraph 5, this contract of carriage is to be
> governed by United States law . . . and the United States
> Federal Court for the Southern District of New York is to
> have exclusive jurisdiction to hear all disputes hereunder
> including third party proceedings or those involving several
> defendants.  This clause supersedes any conflicting clause
> in bills of lading or other documents issued by contractors
> or sub-contractors of OWL.

The OWL bill of lading also contained a "Clause Paramount," providing,

in Clause 5(D), that COGSA and its provision for $500 package limitations would

continue to govern the carriage, not only during the sea voyage to a United States port,

but after as well, "throughout the entire time during which Carrier is responsible for the

goods under the Bill of Lading." See SAUL SORKIN, 1-1 GOODS IN TRANSIT § 1-23

(2007), as to the commonality of such Clauses Paramount.  Clause 5(D) provided:

> 1) If carriage includes carriage to, from or through a port
>    in the United States of America this Bill of Lading shall
>    be subject to COGSA, the terms of which are
>    incorporated herein and shall be paramount through
>    carriage by sea and the entire time that the Goods are in
>    the actual custody of the Carrier or its sub-contractor at
>    the sea-terminal in the United States of America before
>    loading onto the Vessel or after discharge therefrom as
>    the case may be.  COGSA shall be extended to apply to
>    all goods before the Goods are loaded on and after they
>    are discharged from the Vessel and throughout the
>    entire time during which Carrier is responsible for the
>    goods under the Bill of Lading. . . .

> 3) If COGSA applies then the liability of the Carrier shall not exceed US $500 per package . . . unless the value of the Goods has been declared on the face hereof with the consent of the Carrier and extra freight has been paid in which case Clause 10 shall apply and the declared value (if higher) shall be substituted for the limit and any partial loss or damage shall be adjusted pro-rata on the basis of such declared value.

OWL's bill of lading authorized it, as an NVOCC, to engage VOCCs and common carriers to transport the goods to their final destination. OWL engaged Yang Ming to effect that transportation, by sea and ground transport, pursuant to contract dated December 27, 2005 and sea waybill issued by Yang Ming to OWL on June 16, 2006. OWL did not declare the value of the goods being transported in the sea waybill.

## 2. Yang Ming's Bill of Lading (the "Sea Waybill")

Yang Ming's sea waybill, delivered to and accepted by OWL, provided that only Yang Ming, and no subsequent carrier it might engage, would be liable for any damage to the goods being transported. Clause 4(2) of Yang Ming's sea waybill provided:

> It is understood and agreed that, other than the Carrier, no Person, firm or corporation or other legal entity whatsoever (including . . . Underlying Carriers . . . and/or any other independent contractors whatsoever utilized in the Carriage) is, or shall be deemed to be, liable with respect to the Goods as Carrier, bailee or otherwise.

Clause 7(1) was a Himalaya clause to give added protection to subsequent downstream carriers, and to provide that COGSA (and the default $500 package limitation provided by COGSA), was to be "compulsorily applicable" to all subsequent carriers engaged by Yang Ming:

> [I]n the event that this Bill covers shipments to or from the United States, then COGSA shall be compulsorily applicable and shall (except as may be otherwise

> specifically provided elsewhere herein) also govern before the Goods are loading [sic] on and after they are discharged from the Vessel provided, however, that the Goods at said times are in the actual custody of the carrier or any Underlying Carrier or Subcontractor.

According to the sea waybill, all claims and disputes were to be governed by English law and determined by English courts.  Clause 26 of Yang Ming's sea waybill provided:

> Except as otherwise provided specifically herein, any claim or dispute arising under this Bill shall be governed by the law of England and determined in the English courts to the exclusion of the jurisdiction of the courts of any other place.

> Clause 23 of Yang Ming's sea waybill provided a $500 package

limitation:

> In the event this Bill covers the Goods moving to or from a port of final destination in the United States, the Carrier's limitation of liability in respect to the Goods shall in no event exceed U.S. Dollars $500 per package . . .

> Clause 23(4) provided that the shipper could pre-empt the package

limitation by declaring a higher value for the merchandise being shipped:

> The aforementioned limitations of liability set forth in this provision shall be applicable unless the nature and value of the Goods have been declared by the Merchant before shipment and agreed to by the Carrier, and are inserted in this Bill and the Applicable "ad valorem" freight rate, as set out in Carrier's Tariff, is paid. . . .

The face of Yang Ming's sea waybill contained provisions allowing the Shipper to declare the full value of the merchandise covered by the bill of lading, and thereby gain the right not to be bound by the package limitation and to recover full value of the merchandise in case of loss or damage.  The Yang Ming bill of lading was left blank; no actual value was declared.

### 3.  Transportation of the Packages

The seven packages of printing equipment were carried without incident from Bremerhaven, Germany to Norfolk, Virginia aboard Yang Ming's ocean vessel, the M/V YANG MING MILANO, and from Norfolk to Chicago, Illinois, by The Norfolk & Southern Railroad Company.  Yang Ming's subcontractor, Djuric picked up the cargo at Norfolk & Southern's Chicago rail terminal on July 6, 2006[4] and, on the last leg of the voyage, during the drive to Bourbon, Indiana, collided with a bridge overpass, damaging the seven packages of printing equipment.  The cargo was delivered in damaged condition to the consignee in Bourbon, Indiana on July 11, 2006.

OWL gave notice to Yang Ming of the damaged equipment the next day. Djuric acknowledged that the damage occurred while the goods were in its custody, but maintained that it could not be liable for more than the COGSA limitation of $500 per package, or $3500 in all.  Royal & Sun, seeking full value, filed this lawsuit against OWL, and OWL followed by filing third-party lawsuits against Yang Ming and Djuric. Royal & Sun's motion papers asserted its claims for full value against OWL, and Yang Ming and Djuric jointly and severally.

For the reasons stated below, defendant OWL's motion is granted, limiting its liability to Royal & Sun to $500 per package.   Third-party defendants Yang Ming and Djuric, as downstream carriers, are entitled also to the benefit of the package limitations, and therefore also are not liable to Royal & Sun.   OWL and Yang Ming and Djuric are jointly and severally liable to Royal & Sun for $3500, and OWL may recover its liability from Yang Ming and Djuric.

### B.    Limitations of Liability Under COGSA and Carmack

---

[4] Djuric did not issue its own bill of lading.

The principles underlying liability limitations in contracts of carriage date back to the early 20th century, when the transportation of goods was a much more dangerous business than it is today. As one author notes:

> Liability of carriers for loss and damage to goods has always been subject to special considerations. The rules developed at a time when the risks of transportation were substantially greater than they are today. Voyages by sea were undertaken by small vessels. The navigation was celestial or the equipment primitive. There was no radio, radar, television or other electronic equipment or devices for communication.

SORKIN, 3 GOODS IN TRANSIT § 13.00.

Although the carrier clearly faced serious risks in shipping goods, the shipper was, in many cases, in even worse condition, since the carrier often had exclusive control over the goods for a lengthy period of time, and the shipper was rarely able to communicate with the carrier as to the status of the shipment. Id. This perceived imbalance in power led to the common law rule of a carrier being liable for all goods stolen or damaged while in the carrier's custody in nearly all situations. Carriers responded by introducing liability limitations into their bills of lading, limiting damages either to a fixed amount or an amount determined by formula and based on the weight, number of packages, or other objective characteristic of the shipment. Id. As safer, more efficient methods of transportation were developed and technology in the industry improved, the justifications for liability limitations also changed. Justice Breyer (writing as Chief Judge of the First Circuit) commented on the applicable policies:

> In a commercial context, liability limitations have certain advantages. They permit a carrier to avoid unforeseeably high liability for especially valuable cargo; they permit shippers of ordinary items to pay somewhat lower freight bills; and they permit shippers of valuable items to choose between paying an insurance premium to the carrier and

11

obtaining, perhaps less expensive, insurance on their own. On the other hand, such clauses risk unfairness, where, for example, a shipper is, in fact, unaware of the limitation and his choices. Yet, the requirements of reasonably communicative notice and an opportunity to buy increased coverage for a premium payment lessen the risk of unfairness. And, as we have said, balancing advantages and disadvantages, both Congress and the courts have approved the use of such clauses.

Hill Const. Corp. v. American Airlines, 996 F.2d 1315, 1317 (1st Cir. 1993) (internal citations omitted).

Both statutes governing the motions before me, COGSA and the Carmack Amendment to the Interstate Commerce Act of 1906, authorize limitations of liability clauses in bills of lading, but in different ways and subject to different statutory requirements. COGSA's limitation of liability provides the following:

Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States, or in case of goods not shipped in packages, per customary freight unit, or the equivalent of that sum in other currency, unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading. . . .

46 U.S.C. app. § 1304(5).[5]

COGSA applies to goods carried over the high seas, beginning from the loading of goods aboard ship to their unloading, from "tackle-to-tackle." 46 U.S.C. app. § 1301(e). However, COGSA recognizes that the ocean voyage is but one phase of multi-modal carriages of goods, and that ocean carriers frequently are engaged to organize the inland continuations of ocean carriages. Thus, COGSA provides that shippers and ocean carriers (and related others) may extend package liability limitations

---

[5]  Carmack's limitation of liability provisions are discussed in a later section.

to the carriers engaged for the continuing carriage, until the goods are carried to their

final destination:

> Nothing contained in [COGSA] shall prevent a carrier or a
> shipper from entering into any agreement . . . as to the
> responsibility and liability of the carrier or the ship for the
> loss or damage to or in connection with the custody and
> care and handling of goods prior to the loading on and
> subsequent to the discharge from the ship on which the
> goods are carried by sea.

46 U.S.C. app. § 1307.

Bills of lading that extend such limitation-of-liability protections to cover

the entire inter-modal transportation, to ground carriers of goods as well as ocean

carriers, have become common and efficient practices, enforced by the courts.  See, e.g.,

Norfolk Southern Railway Co. v. Kirby, 543 U.S. 14, 29 (2004); see also Schramm, Inc.

v. Shipco Transport, Inc., 364 F.3d 560, 566 (4th Cir. 2004) (holding that "parties to a

bill of lading are entitled to contract for extensions of COGSA beyond its customary

scope," including while the goods are in a sub-contractor's custody).

In a deregulated environment, shippers and carriers rely on their

contractual arrangements, made directly and through intermediaries, to provide for safe

transportation of goods, moving from one carrier to another at low, competitive prices:

> There must be an incentive for the carrier to transport the
> goods safely. While in many cases competition and the
> desire to maintain good customer relations and to obtain
> repeat business is an incentive to the carrier, it is not always
> sufficient. Competition often has the effect of reducing the
> freight charge to the point where carriers cannot afford to
> properly maintain the transportation vehicles or employ the
> type of person who will safely transport the goods. In many
> cases, particularly in a deregulated environment, the
> shipper is not the carrier's customer. The carrier's business
> comes from third party intermediaries, shipper's agents,
> brokers, forwarders, cooperatives, etc.

SORKIN, 3 GOODS IN TRANSIT, § 13.00.

As the United States Supreme Court recognized, shippers and intermediaries balance costs of insurance and freight, and enter into package limitation clauses according to their evaluations of the relative economies and efficiencies between higher freight rates and lower insurance rates, or lower freight rates and higher insurance rates, in determining the relative responsibilities, between carriers and insurers, should their goods be damaged in transit.  See Kirby, 543 U.S. at 29 (2004).

In Kirby, an Australian shipper engaged a freight forwarder to arrange transportation of machinery from Australia to Huntsville, Alabama.  The freight forwarder engaged Hamburg Süd ("Hamburg"), a German ocean carrier, for the ocean portion of the transportation, and Hamburg engaged Norfolk Southern Railway Company ("Norfolk Southern") for the onward transportation to Huntsville.  Both the freight forwarder and the ocean carrier issued through bills of lading: the freight forwarder to the shipper, and the ocean carrier to the freight forwarder.  Both bills of lading provided $500 per package damage limitations (COGSA limitations); and both had Himalaya clauses and Clauses Paramount that extended the package limitations to subsequent carriers.

Norfolk Southern's train derailed, causing substantial damage to the cargo.  Kirby, the Australian shipper, sued Norfolk Southern to recover the full value of the goods, arguing that neither the freight forwarder nor the ocean carrier had authority to enter into a package limitation curtailing the shipper's rights.

Justice O'Connor, writing for a unanimous court, upheld the package limitation and the intermediary's authority, inherent in shipping arrangements, to agree to such limitations.

> When an intermediary contracts with a carrier to transport goods, the cargo owner's recovery against the carrier is limited by the liability limitation to which the intermediary and carrier agreed. The intermediary is certainly not automatically empowered to be the cargo owner's agent in every sense. That would be unsustainable. But when it comes to liability limitations for negligence resulting in damage, an intermediary can negotiate reliable and enforceable agreements with the carriers it engages.

Kirby, 543 U.S. at 33.

The United States Supreme Court, in interpreting and applying COGSA, thus gave primacy to the commercial context in which international and multi-modal transportation is arranged. It would add unduly to costs, and inevitably give rise to higher rates, if carriers were not able to deal at face value with the intermediaries engaged by the shipper to arrange for intermodal shipments. As the Court ruled, a rule that would require "downstream carriers to distinguish between cargo owners and intermediary shippers might interfere with statutory and decisional law promoting nondiscrimination in common carriage," and would "undermine COGSA's liability regime." Id. at 35.

Thus, Kirby limited the railroad's liability to the $500 per package limitation provided in the bills of lading issued by the freight forwarder to the shipper, and by the ocean carrier to the freight forwarder (acting as the intermediary). Norfolk Southern was an intended third-party beneficiary, entitled to enjoy the protection of the Himalaya clause and the Clause Paramount set out in both bills of lading.

Kirby is indistinguishable from the case that I have to decide. The OWL bill of lading, in Clause Paramount 5(D)(3), provides similar COGSA protection, limiting OWL's liability to $500 per package in the absence of any declaration of higher value by the shipper and providing, in Clause 7, that the limitation was to extend to all the carriers and sub-contractors engaged to carry the printing equipment to their ultimate destination

in Bourbon, Indiana.  Thus, White Horse agreed not to be entitled to recover more than

the $500 per package limitation provided by the agreement and COGSA, or $3,500 for

the seven packages damaged in transit, regardless whether the goods might be damaged

in the ocean portion of the carriage, or in the rail or truck portion of the carriage.

### 1.       The Carmack Amendment

The Carmack Amendment to the Interstate Commerce Act, codified at 49

U.S.C. § 11706, was enacted in 1906.  It was intended to end the victimization by

railroads of shippers, particularly small Midwestern farmers, through exorbitant and

discriminatory rates, rebates and other abuses, and to reverse a number of Supreme Court

interpretations that narrowed the scope of the Interstate Commerce Act of 1887,[6] and

reversed decisions, and weakened the jurisdiction, of the Interstate Commerce

Commission.  2 HARRY J. CARMAN AND HAROLD C. SYRETT, A HISTORY OF THE

AMERICAN PEOPLE 92, 99-101 (Knopf 1952).  The Carmack Amendment established a

"nationally uniform policy governing interstate carriers' liability for property loss."  New

York, N.H. & H.R. Co. v. Nothnagle, 346 U.S. 128, 131 (1953).  One major purpose was

to make it easier for shippers to gain redress from railroads "to litigate claims against

carriers in forums convenient for the shippers."  Another major purpose was to give

shippers the "right to proceed against the initial carrier in a case where damage or loss

occurred while the shipment was in the hands of a subsequent carrier, in order "to relieve

shippers of the burden of searching out a particular negligent carrier from the often

numerous carriers handling an interstate shipment of goods."  Aaacon Auto Transport,

Inc. v. State Farm Mutual Automobile Ins. Co., 537 F.2d 648, 653 (2d Cir. 1976); see

---

[6]  Known also as the Cullom Act, after Senator Shelby Cullom of Illinois.  The Carmack Amendment was
part of the reform legislation introduced by the Progressive movement and the administration of President
Theodore Roosevelt. II Harry J. Carman and Harold C. Syrett, A History of the American People 101
(Knopf 1952).

also Reider v. Thompson, 339 U.S. 113, 119 (1950).  The Carmack Amendment established "uniform federal guidelines . . . surrounding a carrier's liability when damage occurs to a shipper's interstate shipment."  Hughes v. United Van Lines, 829 F.2d 1407, 1415 (7th Cir. 1987).

During the Great Depression and continuing into the post World War II years, the Interstate Commerce Commission and other regulatory agencies regulating air, water and motor carriers became increasingly powerful in regulating the fairness and reasonableness of freight rates (and of many other incidents of commerce).  By 1980, however, the growing diversity and sophistication of the American economy improved the ability of shippers to choose among modes of transportation, and decreased the power of monopoly positions of the railroads and other carriers. Congress came to believe that competition and free play of market forces could better improve efficiencies and economies in transport than regulation.

In 1980, the Staggers Rail Act was passed to bring about a measure of deregulation in the rail transportation industry and rely more on competition, rather than regulation, to set rates by rail carriers.  See 49 U.S.C. § 10502.  Among other things, the Staggers Act authorized the Interstate Commerce Commission ("ICC") to exempt a rail carrier's transport from the provisions of Carmack when that transport was part of a continuous intermodal journey.  Id. at § 10502(f) ("The Board may exercise its authority under this section to exempt transportation that is provided by a rail carrier as part of a continuous intermodal movement.").

In 1995, Carmack was again amended.   The Interstate Commerce Commission Termination Act ("ICCTA") eliminated the Interstate Commerce Commission and replaced it with the Surface Transportation Board ("STB") as the

governing body overseeing the rail and motor carrier industry.  The ICCTA divided the former Carmack provisions delineating liability of carriers under bills of lading into three separate categories: 1) for rail carriers; 2) for motor carriers and freight forwarders; and 3) for pipeline carriers.  <u>See</u> SORKIN, GOODS IN TRANSIT, § 3.05.

Section 11706(a) applies to rail carriers, and section 14706(a), to non-rail carriers, including carriers subject to subchapter I or III of chapter 135.  Under subchapter I of chapter 135, the Surface Transportation Board has jurisdiction over "transportation by motor carrier and the procurement of that transportation."  49 U.S.C. § 13501.  Under subchapter III of chapter 135, it has jurisdiction over "service that a freight forwarder undertakes to provide, or is authorized or required under this part to provide."  49 U.S.C. § 13531.  Section s 11706(a) and  14706(a) are identical in imposing strict liability on a carrier for damage caused by that carrier, or by another carrier engaged in the transport of the goods. Section 14706(a)(1) provides:

> The liability imposed under this paragraph is for the actual loss or injury to the property caused by (A) the receiving carrier, (B) the delivering carrier, or (C) another carrier over whose line or route the property is transported in the United States or from a place in the United States . . . transported under a through bill of lading . . .

Section 14706 is the section applicable to the case before me.  The goods being shipped were damaged during the motor carriage portion of the carriage, and the rail carrier is not a defendant in the case and did not issue a separate bill of lading.  Under section 14706(a)(1), a motor carrier is required to issue a bill of lading "for property it

receives for transportation," and is "liable to the person entitled to recover."[7]  Thus, 49

U.S.C. § 14706(a)(1) provides:

> A carrier providing transportation or service subject to jurisdiction under subchapter I or III of chapter 135 shall issue a receipt or bill of lading for property it receives for transportation under this part.  That carrier and any other carrier that delivers the property and is providing transportation or service subject to jurisdiction under subchapter I or III of chapter 135 or chapter 105 [49 U.S.C. § 10501] are liable to the person entitled to recover under the receipt of bill of lading.[8]

Carmack liability "is rooted in strict liability."  Sompo Japan Ins. Co. v.

Union Pac. R.R. Co., 456 F.3d 54, 76 (2d Cir. 2006); see also Rankin v. Allstate Ins. Co.,

336 F.3d 8, 9 (1st Cir. 2003) (holding that Carmack "imposes something close to strict

liability upon originating and delivering carriers.").  Carmack allows motor carriers to

limit their liability "to a value established by written or electronic declaration of the

shipper or by written agreement between the carrier and shipper if that value would be

reasonable under the circumstances surrounding the transportation."  49 U.S.C. §

14706(c)(1)(A).  In contrast, COGSA's standard is negligence, and liability is limited to

$500 per package, unless the shipper opts out and declares a higher value for the objects

of carriage (thus incurring a higher freight rate).  46 U.S.C. app. § 1304(5).

In order to limit exposure under Carmack, the shipper has to be offered a

choice among different types of liability coverage and affirmatively choose "not to pay

the higher freight rate for full coverage under a strict liability rule."  Id.; see also Emerson

---

[7]  In this case, the bill of lading, contemplating the motor carriage as part of the intermodal transport, was issued by Yang Ming, in the form of a sea waybill.

[8]  Section 11706(a) reads as follows: "A rail carrier providing transportation or service subject to the jurisdiction of the Board under this part shall issue a receipt or bill of lading for property it receives for transportation under this part. That rail carrier and any other carrier that delivers the property and is providing transportation or service subject to the jurisdiction of the Board under this part are liable to the person entitled to recover under the receipt or bill of lading . . ."

Elec. Supply Co. v. Estes Express Lines Corp., 451 F.3d 179, 186-87 (3d Cir. 2006)

(holding that "a carrier must continue to offer two or more rates with corresponding

levels of liability in order to successfully limit its liability pursuant to the Carmack

Amendment."); Sassy Doll Creations, Inc. v. Watkins Motor Lines, Inc., 331 F.3d 834,

841 (11th Cir. 2003) (holding that "a carrier wishing to limit its liability is still required

to give the shipper a reasonable opportunity to choose between different levels of

liability.").

        Under COGSA, in contrast, the default limitation is $500 per package, and

can be increased only by agreement of the parties.  46 U.S.C. app. §1304(5).

## C.    Standard of Review

        Summary judgment may be granted if there are "no genuine issues as to

any material fact and . . . the moving party is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(c).  A "genuine issue" of "material fact" exists "if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party."  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  The moving party bears the burden of

"informing the district court of the basis for its motion" and identifying the matter that "it

believes demonstrate[s] the absence of a genuine issue of material fact."  Celotex Corp. v.

Catrett, 477 U.S. 317, 323 (1986).  The burden then shifts to the non-moving party to

come forward with competent evidence:

> When a motion for summary judgment is made and
> supported as provided in this rule, an adverse party may not
> rest upon the mere allegations or denials of the adverse
> party's pleading, but the adverse party's response, by
> affidavits or as otherwise provided in this rule, must set
> forth specific facts showing that there is a genuine issue for
> trial.  If the adverse party does not so respond, summary

judgment, if appropriate, shall be entered against the
adverse party.

Fed. R. Civ. P. 56(e). Although all facts and inferences therefrom are to be construed in
favor of the party opposing the motion, <u>Harlen Assocs. v. Village of Mineola</u>, 273 F.3d
494, 498 (2d Cir. 2001), that party must raise more than just a "metaphysical doubt" as to
a material fact. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587
(1986). "[M]ere speculation and conjecture is insufficient to preclude the granting of the
motion." <u>Harlen</u>, 273 F.3d at 499. Accordingly, if the "evidence favoring the
nonmoving party is merely colorable or is not significantly probative, summary judgment
may be granted." <u>Anderson</u>, 477 U.S. at 249-50 (citations omitted).

### D. Discussion

### 1. OWL's Liability as an NVOCC under COGSA

This case involves two bills of lading, the OWL bill of lading which
reflects an agreement between OWL and White Horse; and the Yang Ming sea waybill,
which reflects an agreement between Yang Ming and OWL, acting as White Horse's
intermediary. Under the OWL bill of lading, the shipper, White Horse, had the option
either to declare the full value of the packages and pay additional freight to OWL for the
extra value of the shipment, or to decline to declare value and either insure independently
or self-insure, that is, forego insurance. White Horse declined to declare value and
insured independently. As White Horse's insurer, Royal & Sun thus accepted the
possibility that, in case the goods were damaged during transit, it would be liable to
White Horse for the insured value of the goods, yet have but limited recourse of $500 per
package against OWL, or any agents engaged by OWL. Royal & Sun is presumed to
have accepted this limitation when it agreed to insure White Horse for the full value of its
printing equipment, and to have charged an insurance premium to reflect that its

21

subrogation right would be less than the damage it undertook to insure. To allow Royal & Sun to collect full value from OWL would give Royal & Sun a windfall. Nevertheless, Royal & Sun seeks full recovery, arguing that the Carmack Amendment applies where goods are damaged during the land portion of a transit, not COGSA, and that the more stringent qualifications of the Carmack Amendment regarding package limitations gives White Horse, and therefore Royal & Sun, the right to full recovery.

Royal & Sun's argument is that the bill of lading issued by OWL, as an NVOCC, and, specifically, the provisions providing $500 per package limitations on liability, although enforceable under COGSA, see 46 U.S.C. §30701; see also Kirby, 543 U.S. at 30-33; Schramm, 364 F.3d at 566, is not enforceable under Carmack. Royal & Sun argues that because the goods were damaged during the inland trucking portion of the carriage, covered more specifically by Yang Ming's, rather than OWL's, bill of lading, the Carmack Amendment, not COGSA, should apply. Under the Carmack Amendment, its argument proceeds, there are more restrictive conditions for establishing liability limitations, and since these conditions were not met, the shipper is entitled to recover the full value of the goods being shipped, and not just $500 per package.

The important question is if the Carmack Amendment regulates the liability of companies like OWL – NVOCCs that engage ocean carriers, and then inland rail and motor carriers, to perform a multi-modal carriage of goods. By its terms, the Carmack Amendment does not apply to NVOCCs. OWL's bill of lading specifically provided that the carriage of the goods it was to transport was to be governed by COGSA, and that, in the absence of a declaration of value of the goods being shipped, its liability for any loss or damage was to be limited to $500 per package. As an NVOCC, OWL is regulated by the Federal Maritime Commission ("FMC"), an independent

regulatory agency established by the Reorganization Plan No. 7, eff. Aug. 12, 1961, 75

Stat. 840.  The FMC is responsible for the administration of the regulatory provisions of

the shipping laws.  46 U.S.C. § 40102 et seq.  The FMC regulates ocean carriers,

including NVOCCs.  See 46 U.S.C. § 40102(16); see also Logistics Mgmt, Inc. v. One

Pyramid Tent Arena, 86 F.3d 908, 913 (9th Cir. 1996) (noting that "NVOCCs are

regulated by the Federal Maritime Commission.").  As an NVOCC, OWL is authorized to

issue bills of lading, even though it, itself, does not perform the carriage of goods.

        Section 14706 of the Carmack Amendment defines the categories of non-

rail carriers and other entities to which it applies.  Section 14706 imposes liability on

motor carriers, on freight forwarders who procure transportation by motor carrier, and on

any other carrier who provides transportation by motor carrier, rail carrier, or service by a

freight forwarder.  OWL does not fit these definitions, for it is not a "motor carrier", nor

is it a "freight forwarder," nor is it an "other carrier who provides transportation by motor

carrier, rail carrier, or service by a freight forwarder," even though a company that OWL

might engage might, in turn, wish to engage a motor or rail carrier to complete the

carriage of goods OWL undertook to arrange.

        An NVOCC is not a freight forwarder.  See Prima U.S. v. Panalpina, Inc.,

223 F.3d 126 (2d Cir. 2000) (distinguishing NVOCCs from freight forwarders).  As

Prima describes, NVOCCs consolidate cargo for shipment by an ocean carrier, and the

ocean carrier, or some other entity, must thereafter engage inland carriers to complete the

carriage of goods to an inland destination.

> The job of a non-vessel operating common carrier
> ("NVOCC") is to consolidate cargo from numerous
> shippers into larger groups for shipment by an ocean
> carrier. A NVOCC – as opposed to the actual ocean carrier
> transporting the cargo – issues a bill of lading to each

> shipper. A freight forwarder . . . , on the other hand, simply
> facilitates the movement of cargo to the ocean vessel . . .
> [u]nlike a carrier, a freight forwarder does *not* issue a bill of
> lading, and is therefore not liable to a shipper for anything
> that occurs to the goods being shipped.

Id. at 129 (internal citations omitted). Yang Ming was the party that engaged the motor

transportation (via Djuric) and, if Carmack potentially applies, it applies to Yang Ming

and Djuric, not OWL.

Sompo, the Second Circuit case on which Royal & Sun principally relies,

involved a claim by a shipper against a rail carrier, not against an ocean carrier or

NVOCC. In Sompo, 32 tractors were shipped from Tokyo, Japan, to Swanee, Georgia,

by way of the port of Los Angeles, CA. The shipper hired the ocean carrier, Mitsui OSK

Line Ltd. ("Mitsui"), to arrange for through transport from Japan to Georgia, including

the domestic inland portion. Mitsui engaged defendant Union Pacific, a rail carrier, to

carry the goods from the ship dock in Los Angeles to the terminal point in Swanee,

Georgia. The shipper did not declare a value for the goods being shipped; no such

mention was identified in the spaces provided on the bill of lading issued by Mitsui. The

bill of lading provided that COGSA's $500 per package damage limitation would apply,

not only to the ocean voyage, but also, through a Himalaya clause and a Clause

Paramount, to all subsequent carriers of the goods to final destination.

The train carrying the cargo from Los Angeles to Georgia was derailed in

Texas and the packages were damaged. Sompo, the shipper's insurer, paid the full value

of the shipper's claim, and then filed suit as subrogee against defendant Union Pacific,

seeking recovery of its outlay. Union Pacific objected to any recovery against it beyond

the $500 per package limitation provided in Mitsui's bill of lading.

The District Court granted judgment to Union Pacific, upholding the $500 per package limitation, but the Court of Appeals reversed. The Court of Appeals ruled that Sompo could recover the full value of the goods, because the Carmack Amendment of 1906 and the Staggers Act provided a different regimen of liability than COGSA, and it was Carmack, not COGSA, that applied to rail carriers. The Court of Appeals held that Carmack's statutory provisions trumped the parties' contract provisions that purported to apply the COGSA package limitations. The Court of Appeals held that since the lawsuit was against the inland carrier, the Union Pacific railroad, not the ocean carrier, Mitsui, and that Carmack, not the federal maritime laws, governed the liability of land carriers, the more stringent requirements for package limitation under Carmack, rather than the more liberal provisions under COGSA, would apply.

The Court of Appeals acknowledged that COGSA provided that parties could extend their bills of lading to the land portion of their multi-modal journey. However, such arrangements made by the parties were ex contractu, reflecting their private agreements, and could not take precedence over the direct provisions of the federal statute:

> To apply COGSA here to the exclusion of Carmack would be to contradict well-established circuit precedent holding that period of responsibility provisions do not have statute-like status and would undermine the text of the statute itself, which explicitly states that COGSA does not affect laws governing the carriage of goods prior to loading and after discharge.

Sompo, 456 F.3d at 74-75 (internal citations omitted).

The Court of Appeals acknowledged that although one section of COGSA, 46 U.S.C. app. § 1312, dealing with coastwise trade, provided that package limitations agreed by the parties would have the full force of a statute, the more applicable section,

46 U.S.C. app. § 1307, dealing with inland extensions of ocean carriage, did not have

such a provision.  The Court of Appeals reasoned that Congress therefore must have

intended to draw a contrast between ships plying the coastal waters, and railways and

trucks that extended over-seas carriages inland, applying COGSA package limitations

agreed by the parties to the former, and requiring tighter provisions required by Carmack

to the latter.  Sompo, 456 F.3d at 71-72.  The Court of Appeals remanded the case to the

District Court to evaluate if the shipper was given "fair opportunity" to insist on the rail

carrier's full, rather than limited, liability, under Carmack's provisions for the inland

carrier's strict liability for damaged cargo, regardless of fault.  Id. at 75-76.

        The Court of Appeals observed in Sompo that the blank spaces on the face

of the sea waybill, allowing the shipper to declare full value of the cargo and receive full

coverage in the carrier's bill of lading, was not by itself sufficient to meet Carmack's

liability requirements.  Id. at 75-76. Carmack requires, the Court of Appeals held, that the

shipper must be given "fair opportunity" to decide between varying levels of liability

coverage, a question of fact on which a court should consider evidence.  Thus, the Court

of Appeals held, a package limitation clause that would satisfy COGSA is not necessarily

enforceable to domestic inland carriers governed by Carmack.

> Union Pacific's argument is without merit because,
> although Clause 29(2) provides the option of full coverage
> under COGSA, it does not provide the option of full
> coverage under Carmack . . .[b]ecause COGSA and
> Carmack create two different liability standards, we cannot
> assume that the shipper contracting with Union Pacific had
> the opportunity to choose among several types of liability
> coverage and opted not to pay a higher freight rate for full
> coverage under a strict liability rule.
>
> Sompo, 456 F.3d at 76.

OWL, unlike the defendant rail carrier in <u>Sompo</u>, is an NVOCC and, as an NVOCC, OWL is not subject to Carmack liability or benefits, for it does not "provid[e] transportation or service" under subchapter I or III of chapter 135 of title 49, United States Code.  49 U.S.C. §§ 13501, 13531.  <u>Sompo</u> fixed full liability on a railroad covered specifically by the rail transportation provisions of Carmack, 49 U.S.C. § 11706(a), not on an NVOCC governed by the FMC.  COGSA, not Carmack, governs the liability of NVOCCs, not only with respect to damages occurring to merchandise in transit during the ocean portion of a multi-modal carriage of goods, but as well to the inland portions of carriage contemplated by the bill of lading issued by the NVOCC.  <u>See Indemnity Ins. Co. of N. America v. K-Line America, et al.</u>, No. 06 Civ. 0615 (BSJ) (S.D.N.Y. Feb. 27, 2008); <u>Rexroth Hydraudyne B.V. v. Ocean World Lines, et al</u>, No. 06 Civ. 5549 (LAK), 2007 541958 (S.D.N.Y. Feb. 14, 2007).

<u>Project Hope</u>, also relied on by Royal & Sun, and, like <u>Sompo</u>, also distinguishable, presents a reverse multi-modal carriage of goods, an exportation from within the United States, by land and sea carriage, to a destination abroad.  <u>Project Hope v. M/V IBN SINA</u>, 250 F.3d 67 (2d Cir. 2001).  The shipper in that case, Project Hope, engaged an NVOCC to ship a perishable medical substance, "humulin," a form of insulin used by diabetics, from its warehouse in Winchester, Virginia, to Cairo, Egypt.  The NVOCC contracted separately with a trucker and an ocean carrier to transport the goods to destination.  The trucker was instructed to pick up a refrigerated container from the ocean carrier, to bring it to Project Hope's factory to be loaded at a set temperature and, under a separate bill of lading issued by the NVOCC to the trucker, to transport the loaded container to ship-side in Norfolk, Virginia.  However, the trucker set the container at sub-zero temperature, and both the NVOCC and the trucker failed to issue proper

refrigeration instructions to the ocean carrier.  The humulin, having become unusable and a total loss, was not loaded aboard ship, and had to be replaced.  Project Hope sued to recover its damage.

       The ocean carrier was dismissed from the suit, and the District Court awarded judgment against both the NVOCC and the trucker, jointly and severally.  The Court of Appeals affirmed.  The Court of Appeals ruled that the Carmack Amendment, not COGSA, applied to the trucker's inland carriage from one city in Virginia to another and that, in any event, there was no indication that the NVOCC and the ocean carrier made any effort to extend the per-package limitation under  COGSA to the inland portion of the carriage.  Id. at 74-75.  Since the trucker was unable to excuse the damage to the cargo, the trucker, under Carmack, was liable to the shipper "for the actual loss or injury to the property."  See 49 U.S.C. §§ 13501, 14706(a).   Furthermore, Carmack, and not Virginia law, applied because the parties were aware, and intended, that the trucker's inland carriage was part of an exportation to a foreign destination.  Project Hope, 250 F.3d at 75 (citing Swift Textiles, Inc. v. Watkins Motor Lines, Inc., 799 F.2d 697, 698-00 (11th Cir. 1986)).  It did not matter that the trucker was operating under a separate bill of lading.

       As to the NVOCC, the District Court ruled, and the Second Circuit affirmed, that the NVOCC was also at fault for not properly transmitting the shipper's instructions regarding refrigeration.  The Court of Appeals held that the faults of the trucker and the NVOCC could not be apportioned between them, and that the NVOCC and the trucker were both liable, jointly and severally, to the shipper.  Since the Court of Appeals held that Carmack does not apply to the liability carriers inter se, the award of

joint and several liability could be fixed under general principles of admiralty law.

Project Hope, 250 F.3d at 79.

### E.    Conclusion as to OWL's Liability

White Horse, the shipper, engaged OWL to arrange transportation, through to destination in Bourbon, Indiana, of seven packages of printing equipment, and accepted OWL's bill of lading, including its $500 per package liability limitation, for the entire transportation.  White Horse declined its option to declare a higher value for the goods.  Under COGSA and Kirby, neither White Horse nor Royal & Sun, White Horse's insurer, can recover a larger sum from OWL than the indicated package limitation of $500 per package.

Accordingly, OWL's motion for partial summary judgment is granted. The portion of Royal & Sun's claim that seeks recovery beyond $3500 is dismissed.  I turn now to Royal & Sun's claim against Yang Ming and Djuric.

### F.    Yang Ming & Djuric's Motion to Dismiss on the Basis of the Foreign Forum Selection Clause and Covenant Not to Sue in Yang Ming's Bill of Lading

Clause 26 of the Yang Ming sea waybill of lading provides:

> Except as otherwise provided specifically herein any claim or dispute arising under this Bill shall be governed by the law of England and determined in the English courts to the exclusion of the jurisdiction of the courts of any other place.

But Clause 7 of the OWL bill of lading states the following:

> Law & Jurisdiction – Whenever COGSA . . . applies by virtue of paragraph 5, this contract of carriage is to be governed by United States law . . . and the United States Federal Court for the Southern District of New York is to have exclusive jurisdiction to hear all disputes hereunder including third party proceedings or those involving several defendants.  *This clause supersedes any conflicting clause*

> *in bills of lading or other documents issued by contractors*
> *or sub-contractors of OWL.* (emphasis added).

Yang Ming argues that since OWL agreed not to sue anyone but Yang

Ming under the terms of Yang Ming's sea waybill, and that any suit against Yang Ming

would have to be brought forth in an English court of law, White Horse and Royal & Sun

are similarly limited.  The argument is without merit, because the clauses contradict each

other, and go far beyond Yang Ming and OWL's capacities to bind a shipper.

The Supreme Court ruled in <u>Kirby</u> that "intermediaries entrusted with

goods are 'agents' *only* in their ability to contract for liability limitations with carriers

downstream." <u>Id.</u> at 34.  Nothing in <u>Kirby</u> can be read to extend that ruling to a forum

selection clause and to a covenant not to sue.  A liability limitation in a contract for the

carriage of goods expresses the shipper's option to rely on its own insurance, rather than

the carrier or the carrier's insurance, in case the goods are damaged during shipment.  If

an intermediary errs to a shipper's prejudice by agreeing or not agreeing to such a clause

in another's bill of lading, the intermediary can respond in damages.  But prejudice with

respect to a choice of law clause cannot so easily be quantified.  Courts should not readily

assume that an intermediary has authority to require the shipper to file suit, not in a forum

convenient to the shipper, but in a forum chosen by the downstream carrier and

potentially inconvenient to the shipper.  Yang Ming and Djuric argue that since they were

not parties to the bill of lading OWL delivered to White Horse, they cannot be bound to

the forum selection clause provided by that bill of lading. Their point is well-taken; they

cannot be bound by a contract which they did not see and to which they did not agree,

and Yang Ming and Djuric did not see or agree to the contract between White Horse and

OWL.  Similarly, White Horse did not see or agree to the sea waybill that Yang Ming

delivered to OWL.  Although White Horse impliedly authorized OWL to bind it in

certain respects — for example OWL could bind White Horse to a $500 package

limitation under COGSA — OWL lacked the authority  to bind White Horse to a forum

selection clause, especially because the forum selection clause in Yang Ming's sea

waybill contradicted the forum selection clause in the bill of lading that OWL delivered

to White Horse.  White Horse had the reasonable expectation of being able to sue in the

United States District Court for the Southern District of New York, for that was the

forum provided in the bill of lading that OWL delivered to White Horse.  It would be

"unjust and unreasonable" to relegate White Horse to a different forum because of the

forum selection clause in the Yang Ming sea waybill.  See, e.g., D.H. Blair & Co., Inc. v.

Gottdiener, 462 F.3d 95, 102-04 (2d Cir. 2006) (listing factors that preclude enforcement

of a forum selection clause).  Since the OWL choice-of-forum clause was not binding on

Yang Ming and Djuric, and the Yang Ming choice-of-forum clause was not binding on

White Horse, White Horse, and Royal & Sun, White Horse's insurer, had the right to sue

Yang Ming and Djuric wherever they were amenable to being sued, and they were

amenable to suit in the United States District Court for the Southern District of New

York.

   The same analysis applies with regard to Yang Ming's claim that its sea

waybill bars White Horse, the shipper, from suing Djuric, the remote carrier.  Under

Clause 4(2) of Yang Ming's sea waybill, only Yang Ming can be sued.

> It is understood and agreed that, other than the Carrier, no
> Person, firm or corporation or other legal entity whatsoever
> (including . . . Underlying Carriers . . . and/or any other
> independent contractors whatsoever utilized in the
> Carriage) is, or shall be deemed to be, liable with respect to
> the Goods as Carrier, bailee or otherwise.

OWL's bill of lading provides to the contrary, for it gave White Horse, the shipper, the reasonable expectation that, within the $500 package limitation, it could sue the carrier responsible for the loss, and any carrier that transported the merchandise. OWL had no authority (actual, implied or apparent) to give up White Horse's right to sue by accepting the contradictory term in Yang Ming's bill of lading. See Kirby, ruling that the agent's authority extended only to accepting package limitations. White Horse is not bound by Clause 4(2) of the bill of lading Yang Ming delivered to OWL.

For these reasons, I hold that Yang Ming may not limit White Horse's right to sue to a particular court, nor prevent it from suing the carrier responsible for the loss. Yang Ming's and Djuric's motion to dismiss on these two grounds is dismissed.

### G.    The Package Limitation and Royal & Sun's Claims Against Yang Ming & Djuric

Defendants Yang Ming and Djuric next argue that the claims against them should be limited to $500 per package. They rely on Clause 23 of Yang Ming's sea waybill, Clause 5(D) of the OWL bill of lading, and the provisions of COGSA that make such clauses binding, in the absence of shippers' declarations of actual value, to both the ocean voyage and the ensuing transports by rail and truck.

Without question, White Horse agreed to these package limitations, and its insurer fixed a premium and accepted subrogation subject to these package limitations. Royal & Sun's claim against Yang Ming and Djuric for full value is a claim for a windfall, precisely the same windfall as Royal & Sun claims against OWL, and is a claim, for the reasons set out earlier in this decision, that I deny. Yet, if the Second Circuit decision in Sompo is followed, Royal & Sun would win its windfall against Yang Ming and Djuric. How can that be?

In <u>Kirby</u>, the 2004 decision of the United States Supreme Court, a foreign shipper sued an American railroad for the full value of the goods damaged by a de-railing. Justice O'Connor, for a unanimous court, limited the recovery to the $500 per package limitation provided by the bill of lading and by COGSA. Justice O'Connor held that COGSA should be extended coterminous with the entire inter-modal nature of the transportation, as the bill of lading had provided.

In <u>Sompo</u>, the 2006 decision of the Second Circuit Court of Appeals, a foreign insurer of a foreign shipper also sued an American railroad for the full value of the goods damaged by a de-railing. Judge Wesley, also for a unanimous panel, ruled in favor of a full recovery. Judge Wesley held that the regulatory scheme of Carmack trumped a contractual extension of COGSA, and required a more elaborate and knowing choice on the part of the shipper, whether to insist on full-value liability of the carrier (and pay the extra freight rate), or to opt for a package limitation.

The facts of the two cases are indistinguishable. The only point of distinction expressed by the Second Circuit is that the Supreme Court's decision in <u>Kirby</u> made no mention of the Carmack Amendment. On that omission, the Second Circuit felt free to depart from the rule of <u>Kirby</u>. But how can it be said that the nine Justices simply forgot about Carmack? If, as the Supreme Court ruled, COGSA extended with the inter-modal shipment to govern the scope of liability of rail and truck carriers, Carmack perforce does not govern that same scope of liability.

The Carmack Amendment was passed to protect American shippers in an era before airplanes and before a major highway system. Without regulation, the American farmer was at the mercy of the railroad monopolist. How can it be said that the foreign shipper – indeed, the foreign insurer of the foreign shipper – is in need of the

same type of protection?  White Horse exercised choice, whether to look to the carriers,

or its insurer, should its export of printing equipment be lost or damaged in transit?  That

choice was clearly understood by all, by White Horse, by OWL, and by Royal & Sun,

and by the clerks, managers and underwriters of each company.  An ocean voyage was

involved, and the forms used by the clerks for contracts and shipping documents

incorporated COGSA, the law that the parties reasonably expected to be applicable.  To

introduce Carmack, and the forms that would incorporate Carmack, in addition to

COGSA, would complicate and confuse matters, and add to the expense of international

trade.

       Of the many protagonists in this case – the insurer, the shipper, the

NVOCC and the VOCC, as well as the railroad and trucker – none is in a class intended

to be benefited by Carmack regulation or in need of the protection of Carmack regulation,

and none could have had a reasonable expectation that liability in case of loss or damage

would be for full value.  Extending Sompo rather that Kirby to the case at bar would not

make sense.

       The sea waybill that Yang Ming issued to OWL covered, not only the

ocean portion of the voyage, but the onward movement of the goods as well, via railroad

and via truck.  The only receipt for the goods and the only recital of the terms and

conditions of carriage was in the Yang Ming sea waybill, for neither Norfolk & Western,

the railroad, nor Djuric, the trucker, issued their own bills of lading.  Kirby recognized

the importance of a single, clear set of forms and laws for clerks to use in providing for

international, inter-modal transport of goods.  Kirby, 543 U.S. at 29 ("Confusion and

inefficiency will inevitably result if more than one body of law governs a given contract's

meaning.").  It is unrealistic to believe that clerks for shippers and ocean common carriers

can juggle contradictory forms incorporating COGSA for one part of an inter-modal

voyage and Carmack terms for another part without creating inefficiencies, confusion and

expense.  Yet that is the likely consequence if <u>Sompo</u> were to be extended to this case.

      <u>Altadis USA, Inc. ex rel. Fireman's Fund Insurance Co. v. Sea Star Line

LLC</u>, 458 F.3d 1288 (11th Cir. 2006), presents a much more reasonable view that better

reflects the need for efficiency and uniformity in international commerce.  The court in

<u>Altadis</u>, applying case law from sister circuits and the Supreme Court's decision in <u>Kirby</u>,

held that the plaintiff shipper could not recover the full value of its damaged goods, and

that the contract of carriage was governed by COGSA's package limitations, not

Carmack.  <u>Altadis USA, Inc.</u>, 458 F.3d at 1294.  The shipper appealed, citing <u>Sompo</u> as

proof of a conflict between circuits.  Pet'r.'s Cert. Br. at 1.  On January 5, 2007, the

Supreme Court granted certiorari, with oral argument scheduled for March 20, 2007.

However, the parties subsequently settled, and the petition for certiorari was dismissed

before the parties presented argument.

      Compare, also, <u>Neptune Orient lines v. Burlington N. and Santa Fe</u>, 213

F.3d 1118, 1119 (9th Cir. 2000) (holding that a separate domestic bill of lading is not

required for the Carmack Amendment to apply); with <u>American Road Service Co. v.

Consolidated Rail</u>, 348 F.3d 565, 568 (6th Cir. 2003) (holding that a domestic bill of

lading is necessary for Carmack liability to apply to an inter-modal journey), <u>Shao v.

Link Cargo (Taiwan) Ltd.</u>, 986 F.2d 700, 703 (4th Cir. 1993) (same), and <u>Capitol

Converting Equip. v. LEP Transport</u>, 965 F.2d 391, 394 (7th Cir. 1992) (same).  <u>See also</u>

David F. Robertson & Michael F. Sturley, <u>Recent Developments in Admiralty and

Maritime Law at the National Level and in the Fifth and Eleventh Circuits</u>, 32 Tulane

Mar. L.J. 493, 527 (Summer 2008).

The commercial interests at stake strongly favor the rule of <u>Kirby</u>, rather than the rule presented in <u>Sompo</u>.  <u>Kirby</u> is the higher authority, and I believe I should follow it.  I therefore limit Yang Ming's and Djuric's liability to $3500 (the $500 per package limitation, times seven, the number of packages).  Since, among the parties responsible for the carriage of the goods, Djuric bears direct responsibility for the loss, under Yang Ming's bill of lading, I grant judgment to OWL against Yang Ming and Djuric, jointly and severally, or, as between them as they ultimately may resolve, to the extent of OWL's liability against Royal & Sun.

Since there are no remaining claims to be decided, the Clerk shall enter judgment in accordance with this Opinion and Order, and mark the case closed.

SO ORDERED.

Place:  New York, New York
Date    August 19, 2008

ALVIN K. HELLERSTEIN
United States District Judge

36